**NATIONAL HOME PRODUCTS, INC. (formerly known as Scotten, Dillon Company), a Delaware Corporation, Plaintiff,**

v.

**Harold GRAY et al., Defendants.**

**Harold GRAY et al., Third-Party Plaintiffs,**

v.

**F. Steven BERG et al., Third-Party Defendants.**

Civ. A. No. 4256.

United States District Court, D. Delaware.

May 18, 1976.

Arthur G. Connolly, Jr., of Connolly, Bove & Lodge, Wilmington, Del., for plaintiff.

R. Franklin Balotti of Richards, Layton & Finger, Wilmington, Del. and Robert P. Knapp, Jr. and Andrew N. Grass, Jr., of Windels & Marx, New York City, for defendants and third-party plaintiffs.

Jack B. Jacobs and Richard A. Levine of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for third-party defendants.

## OPINION

LATCHUM, Chief Judge.

National Home Products, Inc., a Delaware corporation formerly known as Scotten, Dillon Company ("Scotten, Dillon"),[1] brings this action for a declaratory judgment determining liability for $29,940.50 in expenses[2] incurred in connection with a proxy solicitation conducted for the Reconvened 1970 Annual Shareholders Meeting by a majority of the Scotten, Dillon board of directors as lawfully constituted on July

---

1. Pre-trial Order at 1 (Docket Item 180).

2. Viz., Charles P. Young Company ($4,674); Kissel Blake Company ($13,761.12); Windels,

Merritt & Ingraham, Esq. ($11,505.38). [Pre-trial Order at 10 (Docket Item 180)].

22, 1970. The Reconvened 1970 Annual Shareholders Meeting was held on October 27, 1971. Two proposals, voted upon by the shareholders in person and by proxy, were adopted: (1) the expansion of the board of directors from seven to nine members, and (2) the election of Andrew N. Grass, Jr., Robert M. Schroder, Charles A. Baratelli, and Robert A. Goldschmidt to the board. Plaintiff claims that all of the defendants are liable for these proxy solicitation expenses because they promoted the issuance and the dissemination of a proxy statement that violated Section 14(a) of the Securities Exchange Act of 1934[3] and Rules 14a–3, 14a–4, 14a–9 and 14a–11 promulgated thereunder. Liability is also sought to be imposed upon defendants Gray, Hill, Schroder, C. B. Richard, Ellis & Co. and Grass under Rule 14a–9 for their failure to comply with Section 13(d) of the Securities Exchange Act of 1934 and companion regulations.

Subject matter jurisdiction and venue of this action exist by virtue of 15 U.S.C. § 78aa.[4] The case was tried to the Court without a jury from April 28 through May 2, 1975.[5]

**3.** Section 14(a), 15 U.S.C. § 78n(a) reads:
"It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security . . . registered pursuant to section 78l of this title."
Scotten, Dillon shares were and are registered on the Detroit Stock Exchange pursuant to 15 U.S.C. § 78l. (Pre-trial Order at 3, Item 2).

**4.** This suit for determination of liability for proxy solicitation expenses is an action "brought to enforce a duty created by § 14a of the Securities Exchange Act of 1934" against all of the defendants. *Chris-Craft Industries, Inc. v. Independent Stockholders Committee,* 354 F.Supp. 895, 921 (D.Del.1973). Venue lies in this district because the Reconvened 1970 Annual Shareholders Meeting occurred here in Wilmington at which votes were cast by proxies that had been solicited with the aid of the

## I. THE FACTS

### A. *The Background*

This action by Scotten, Dillon grows out of this Court's decision and orders entered in *Dillon v. Berg,* 326 F.Supp. 1214 (D.Del. 1971), aff'd 453 F.2d 876 (C.A.3, 1971).[6] *Dillon v. Berg* was brought in the late summer of 1970 by Len Dillon ("Dillon"), Harold Gray ("Gray") and Fred R. Davis ("Davis"), the so-called "Gray faction" of Scotten, Dillon's board, against F. Steven Berg ("Berg"), William Lerner ("Lerner") and Ernest Summers ("Summers"), the so-called "Berg faction" of the board.[7] The underlying purpose of the original suit instituted by the Gray faction was to oust the Berg faction from control of Scotten, Dillon in order to obtain majority control of the board for themselves. In that action this Court held that the August 20, 1970 Scotten, Dillon annual shareholders meeting was invalid and set aside the election of two directors because of proxy rule violations. The Court then ordered that a Reconvened 1970 Annual Shareholders Meeting be held and proxies be resolicited for the election of directors. Although both factions turned their attention to setting in motion the

allegedly misleading proxy materials. *Prettner v. Aston,* 339 F.Supp. 273, 280 (D.Del.1972).

**5.** Post trial briefing was not completed until December 2, 1975. The evidence in this case consists of 783 pages of trial testimony, 2,346 pages of deposition testimony and 154 trial exhibits.

**6.** The *Dillon v. Berg* suit was only the first of a spate of litigation brought in the battle for control of Scotten, Dillon. See *Dillon v. Scotten, Dillon Co.,* 335 F.Supp. 566 (D.Del.1971); *Dillon v. Berg,* 347 F.Supp. 517 (D.Del.1972); *Schroder v. Scotten, Dillon Co.,* Del.Ch., 299 A.2d 431 (1972). After control was finally resolved in favor of the Berg faction by the Delaware Chancery Court in 1973 in the *Schroder case, supra,* related litigation developed with respect to the award of attorney fees and litigation expenses. *Dillon v. Berg,* 351 F.Supp. 584 (D.Del.1972), vacated and remanded, 482 F.2d 1237 (C.A.3, 1973); *Galdi v. Berg,* 359 F.Supp. 698 (D.Del.1973); *Dillon v. Berg,* (D.Del.) Slip opinion Aug. 25, 1975, now on appeal.

**7.** Andrew N. Grass, Jr. ("Grass") of Windels, Merritt & Ingraham, New York, New York represented the "Gray faction."

process of reconvening the 1970 Annual Shareholders Meeting, it is clear that Gray, Davis and Grass, their attorney, spearheaded this effort. Because each of them exerted a predominate influence on the proxy solicitation here under attack, a brief word about them is in order at this point.

*Harold Gray* was first elected to the Scotten, Dillon board of directors on December 9, 1968. (Tr. 491). He is an attorney in Palm Beach, Florida (Tr. 476) who presently devotes the greater part of his time to counseling Willis H. DuPont in legal matters. (Tr. 477–482). Another of Gray's clients is Phyllis Joan Mandery Briggs Hill ("Hill"). Since 1965 he has functioned in a dual capacity as Hill's attorney and investment adviser. (Tr. 315–316, 343, 495).

About the time Gray became a director of Scotten, Dillon he persuaded Hill to invest extensively in its stock. (Tr. 498–499). As a result, between December 1968 and April 1969 she purchased a total of 29,150 shares of Scotten, Dillon common. (DX 44; Tr. 319–320, 374–375, 238, 246; Docket Item 137 at 9). Then in April 1969 Gray convinced Hill to "sell" him a 10,000 share block known as the "McCusker Block" for $300,000, which sum represented an immediate loss to Hill of $50,000.[8] (Tr. 502, 320–321, 358). Gray did not pay cash for this block of shares (Tr. 362); rather, his consideration was in the form of a promissory note which he drafted and prepared.

(Tr. 363, 550–551; Docket Item 137 at 21). Under the terms of the note as Hill understood them, she obtained a promise from Gray to pay her $300,000 in full upon demand on or before five years.[9] No payments of principal or interest were otherwise required before maturity and it was Hill's erroneous understanding that even after maturity she had to demand payment of the principal for the note to become due. (Tr. 370, 366, 367, 368; Docket Item 137 at 22). Hill was aware that Gray was not personally liable on the note (Tr. 364) and that her only security was the 10,000 shares of the McCusker Block.[10] Hill also knew that she, instead of Gray, under the terms of the note would be assuming the risk of any future decline in their market value. (Tr. 369).

Gray did not review the terms of this transaction with Hill in advance nor did Hill review them with any other attorney. (Tr. 363). On April 24, 1969 Hill signed an agreement memorializing the transaction with Gray (DX 39) and the next day wrote C. B. Richard, Ellis & Co. directing it to transfer record ownership of the McCusker Block to Gray. (DX 42). By July 15, 1969 Gray had received the stock certificate representing the McCusker Block (Tr. 328) which he then forwarded along with his stock power to Hill. (DX 60). Over a year later Gray represented to this Court under oath in *Dillon v. Berg* that he was the

---

**8.** Hill bought the McCusker Block in late December 1968 at $35 per share (DX 44, page 1; Tr. 253–254, 247, 249); between January and early March 1969 she bought approximately another 20,000 shares at prices ranging from $25 to $30 per share. (DX 44; Tr. 251–253). Hill utilized the brokerage services of C. B. Richard, Ellis & Co. (in which Gray was a limited partner) in consummating the bulk of these transactions.

**9.** Mrs. Hill was then married to Stephen Briggs (Tr. 313–314).

> "April 24, 1969
> PROMISSORY NOTE
> ON or BEFORE five (5) years after date, for value received, I promise to pay to PHYLLIS JOAN MANDERY BRIGGS the sum of Three Hundred Thousand Dollars ($300,000.00), at Miami, Dade County, Florida. This note shall not bear interest either before

or after maturity. The maker shall not be personally liable hereunder and the sole security for this note shall be ten thousand (10,000) shares of the common stock of the Scotten, Dillon Co., listed on the Detroit Stock Exchange. Upon default by the maker, the said shares shall forthwith become the property of the said Phyllis Joan Mandery Briggs and this promissory note shall stand cancelled and held to naught.
> Harold Gray ·
> HAROLD GRAY"

**10.** Gray "perfected" Hill's security in the McCusker Block by issuing her a stock power (Docket Item 137 at 24–25; Tr. 366, 374); (DX 41), but Hill was and remains unsure whether she could sell the shares directly upon Gray's "default" or whether she would have to turn the shares over to Gray in order to sell them. (Tr. 367–368).

unqualified beneficial owner of 10,100 shares of Scotten, Dillon (PX 1, par. 4; see also PX 2, par. 1) even though in the interim he had advanced no money to Hill for the so-called purchase of the 10,000 McCusker Block shares. And as of June 1971 the same held true. Gray, captain of the victorious plaintiffs in *Dillon v. Berg*, "owned" 10,000 of his 10,100 shares by virtue of the unwitting beneficence of his client Mrs. Hill, not by virtue of any investment of his personal money or by incurring a personal liability.

*Fred R. Davis*, a Reading, Pennsylvania businessman (Tr. 95–96), was elected to the Scotten, Dillon board on August 26, 1968 (Tr. 132; PX 12 at 1). He initially invested in Scotten, Dillon by purchasing 1,100 shares of common stock during the summer of 1968. (Tr. 121, 101, 103, 104–105). Davis was also the record owner of an additional 2,000 shares of Scotten, Dillon common stock which his friend William Knauer bought in mid-1968. (Tr. 105–106). Knauer was first financial vice president of Helme Products, Inc. (Tr. 380) whose wholly-owned subsidiary, the Bloch Brothers Tobacco Co. (Tr. 386) was and is a major competitor of Scotten, Dillon [National Home Products, Inc.]. (Tr. 388; Pre-trial order (c) (Items 1 & 21)). When Knauer purchased his 2,000 shares about the same time Davis bought his own 1,100 shares, he asked Davis to register the 2,000 shares in Davis' name. Davis did so and then executed a stock power in Knauer's name and handed over twenty 100 share certificates to Knauer. (Tr. 105; Docket Item 72 at 54–56). In *Dillon v. Berg*, Davis was represented to the Court as the beneficial owner of 3,100 shares of Scotten, Dillon common stock. (PX 1, par 4; PX 2, par. 1).

*Andrew N. Grass, Jr.* was a partner in Windels, Merritt & Ingraham of New York City. (Pre-trial Order (c)(15)). Somewhat experienced in the nuances of federal securities law by reason of an eight year stint with the New York Regional Office of the SEC (Tr. 182), he first met Gray in 1965 when the Windels firm was general counsel for C. B. Richard & Co. (Tr. 184), a New York brokerage firm into which D. H. Ellis (of which Gray was a limited partner) later merged. (Tr. 184). In the spring of 1970 Gray contacted Grass about Scotten, Dillon. (Tr. 186). Later, in the fall of 1970, Grass agreed to become a nominee for the Scotten, Dillon board if the plaintiffs in *Dillon v. Berg*, prevailed in nullifying the outcome of the 1970 annual shareholders meeting. (Tr. 257; Docket Item 151 at 91–92).

B. *Gray Faction Strategy for the Reconvened 1970 Meeting*

Shortly after the Court's opinion in *Dillon v. Berg* of May 6, 1971, Gray, Davis and Grass began in earnest to formulate their strategy for reconvening the 1970 Annual Shareholders Meeting. On one occasion Davis contacted Ralph Power ("Power"). The Court in *Dillon v. Berg* had found that Power had been illegally removed from the Scotten, Dillon board in July 1970 and he was held to be the seventh director of the legally constituted board on July 22, 1970. The directors who would have to meet to vote on the arrangements of the Court ordered reconvened meeting were Berg, Lerner and George K. Bissell ("Bissell") of the Berg faction, Gray, Davis and Dillon of the Gray faction and Power. Thus, Power was in the position of holding the swing vote between the two factions.

The purpose of Davis contacting Power was to inform him of the Court's order and to discuss the economic prospects of Scotten, Dillon's tobacco processing subsidiary, the Wisconsin Tobacco Company. (Docket Item 62 at 141). Power had been elected president of Scotten, Dillon in 1968, on the same day that Davis had joined the Scotten, Dillon board. (PX 12 at 1, 2). In the ensuing year the two negotiated with Bloch Brothers on behalf of Scotten, Dillon in order to subcontract the job of packaging Scotten, Dillon brand chewing tobacco in foil pouches. (Docket Item 122 at 92–93). Although such a contract was entered into in January 1969 (PX 56) it was later cancelled by Scotten, Dillon in the spring of 1970, about the time Power's relations with Berg began to sour. (See 326 F.Supp. at 1220; Docket Item 122 at 113; Tr. 134,

415–416; DX 51, 52, 53, 54). On December 9, 1970 the board of directors, then controlled by the Berg faction because of its victory at the 1970 Annual Shareholders Meeting held on August 22, 1970, voted to dismiss Power and to cancel all contractual arrangements with him, (PX 13), accusing him of being responsible for a huge tobacco inventory loss sustained during the 1970 fiscal year. (PX 13 at 4–9; PX 9 at 9, entry # 3): While Davis and Gray voted for Power's dismissal, by the spring of 1971 they apparently began to entertain second thoughts about the propriety of having done so. (Docket Item 122 at 157–158, 160, 169–172). Humiliated in the north, Power relocated in Tallahassee, Florida, where he became an independent tobacco dealer, although still nursing his claim against Scotten, Dillon for what he thought had been a wrongful termination of his employment contract as president of the company. (Docket Item 152 at 3).

An informal gathering at the offices of Helme Products, Inc. in Reading, Pennsylvania on June 25, 1971 brought Gray and Power together again. In mid-June Arthur T. McGonigle, president of Helme Products, (Pre-trial Order (c) (21)) extended an invitation through Davis to Gray to discuss Scotten, Dillon's future. (Docket Item 151 at 95–96; Docket Item 122 at 147). Davis told Gray that McGonigle represented about 30,-000 shares of Scotten, Dillon common stock. (Docket Item 151 at 99, 105). Gray in turn invited Grass, his attorney, to attend. (Docket Item 151 at 99; Docket Item 62 at 130–131). As prearranged, on the 25th Gray and Grass met with McGonigle; Power was also present at McGonigle's request. (Docket Item 152 at 75–76). A variety of topics were apparently discussed, e. g., the possible sale of Scotten, Dillon's tobacco assets to Helme Products, the establishment of a voting trust by McGonigle, the Gray faction and the Berg faction (Docket Item 62 at 145–147; Docket Item 151 at 100–103), but Gray concluded this meeting by asking McGonigle to forward him the names of "good candidates" for the Scotten, Dillon board. (Docket Item 151 at 144–145). Later the same day, at Davis' home

in Reading, Gray, Grass, Power and Davis discussed Power's abrupt dismissal in December 1970. Power was advised that any reconsideration of his claim for wrongful termination of his employment contract would have to be undertaken formally by the entire Scotten, Dillon board to be elected at the Reconvened 1970 Annual Shareholders Meeting and that independent counsel might have to be consulted by the board in connection with the reconsideration. Also by the end of this discussion it was "agreed" that Power would become a nominee for the board on the Gray faction slate of directors to be voted upon by the shareholders at the Reconvened 1970 Annual Shareholders Meeting. (Docket Item 62 at 158, 166).

The direct effect of the opinion and order in *Dillon v. Berg*, of course, was simply to void the election of two directors at the annual shareholders meeting held on August 20, 1970. However, sometime before June 1971 Gray, Davis and Dillon, desirous of gaining control of the company from the Berg faction, apparently decided to attempt to increase the number of positions on the board and to fill these new positions with allies. To do so first meant sheparding a resolution past the seven director board as lawfully constituted on July 22, 1970. The above described discussions with Power were designed to acquaint him with this plan. Next, the Gray faction would have to persuade a majority of the shareholders eligible to vote at the Reconvened 1970 Annual Meeting to support its proposal to expand the board and to vote for its nominees. An attractive slate of candidates was indispensable in this regard and so, for example, in the fall of 1970, Robert Schroder, managing partner of C. B. Richard, Ellis & Co., agreed to become a nominee on the Gray faction's slate. Schroder had long been personally acquainted with Gray (Tr. 486–487) and with Grass. (Docket Item 62 at 40). In turn, Schroder suggested one other nominee for the Gray faction's slate, Edward Sullivan, a certified public accountant, (Docket Item 151 at 131) and advised Gray as to the suitability of another nominee, A. H. Dugan, Houston, Texas oil financier. (*Id.* at

135–137). This strategy chosen by the Gray faction also explains Gray's receptiveness to suggestions for nominees originating from Arthur T. McGonigle, for in Gray's eyes McGonigle was a friend of Davis who appeared to represent either directly or in close alliance with business associates a not insubstantial block of Scotten, Dillon shares eligible to vote at the Reconvened 1970 Annual Shareholders Meeting. (Docket Item 151 at 105). Through Davis, McGonigle passed along the names of Robert A. Goldschmidt, a CPA, (Tr. 139–140; Docket Item 151 at 146; Docket Item 122 at 156–157) and John Russell, counsel to Helme Products, Inc. (Docket Item 171 at 5; Docket Item 151 at 142, 145; Docket Item 122 at 156–157) as nominees for the board. In late June 1971, Grass met with Russell at the Windels firm's office. (Docket Item 163 at 597–598). Also in late June, Davis suggested the names of Charles A. Baratelli and Phillip Rowe, Jr., of Reading, Pennsylvania. (Tr. 140, 177; Docket Item 162 at 490–493). All told, by the end of June 1971 as many as ten qualified individuals from the realm of industry and finance had been recruited preliminarily to the Gray "team" with the aim of ousting the Berg faction from control of Scotten, Dillon.

About this time in consultation with Gray and Davis (Tr. 300; Docket Item 151 at 115, 121–123) Grass prepared resolutions for submission to the meeting of the reconvened Scotten, Dillon board of directors as lawfully constituted on July 22, 1970. That meeting was held on July 1, 1971 in Wilmington where, by a vote of four directors in favor (Dillon, Gray, Power and Davis) to three opposed (Berg, Lerner and Bissell), the reconvened board voted "to retain the firm of Windels, Merritt & Ingraham as special counsel to . . . [Scotten, Dillon] for the purpose of preparing on behalf of the company proxy and proxy soliciting material . . . ." and to recommend to the shareholders at the upcoming Reconvened 1970 Annual Shareholders Meeting that the board be expanded to fifteen members and that nine individuals serve for the following terms:

"To serve until the first regular annual meeting following their election and until their successors have been duly elected and qualified:

Edward Sullivan

A. W. Dugan

"To serve until the second regular annual meeting following their election and until their successors have been duly elected and qualified:

Fred R. Davis

Len J. Dillon

Andrew N. Grass, Jr.

Robert M. Schroder

"To serve until the third regular annual meeting following their election and until their successors have been duly (sic) elected and qualified:

Ralph R. Power

John Russell

Robert A. Goldschmidt."

(PX 14).

However, on July 2, 1971 this Court *sua sponte* held invalid the resolutions recommending an increase in the board's membership to 15 and nominating 9 individuals to serve on it. (DX 1). The Court stated that the direction in subparagraph 4(d) of its June 10, 1971 order "to establish the number of places on the Board of Directors to be filled" at the Reconvened 1970 Annual Shareholders Meeting meant that the lawful July 1970 board should establish the number of places "as required . . . by the by-laws . . . in existence before August 21, 1970," and that since prior to August 21, 1970 there were four vacancies on the board, i. e., two positions up for nomination and two then unfilled positions, at most four individuals could be nominated at the lawful July 1970 board meeting for election at the upcoming Reconvened 1970 Annual Shareholders Meeting. Expressed as the rationale underlying the Court's *sua sponte* action was the fact that in issuing the June 10, 1971 order "[the Court] was trying to put the parties back into the same position, the status quo, as nearly as possible, prior to the August 21, 1970 meeting and to do that . . . [the Court] in effect, disenfranchised people who became

stockholders after the record date for the 1970 annual meeting—certainly those people are not going to be saddled with an increase of nine additional members when that was not even in the wind at the annual meeting in August of 1970 and I am not going to permit that kind of maneuvering to be done at this late date when the special meeting is in lieu of the 1970 annual meeting." (DX 1 at 3–4). This disposition of the July 1 meeting of the reconvened lawful July 1970 board was formalized by a memorandum opinion and order dated July 7, 1971. (PX 5).

On July 16, 1971 the lawful July 1970 board again met to choose the nominees to be voted upon at the Reconvened 1970 Shareholders Meeting. (PX 15). A resolution was passed by the same four to three vote tally recommending the expansion of the board by two directorships, resulting in the establishment of a nine member board equally divided among three classes, "the first class expiring at the regularly scheduled and convened annual meeting next ensuing; the second class expiring one year thereafter, and the third class expiring two years thereafter." Those nominated for the third class were Charles A. Baratelli (to fill the position held by Ralph R. Power), Andrew N. Grass, Jr. (to fill the position held by George K. Bissell), and Robert M. Schroder (to fill the then vacant position created by the board of directors on June 19, 1969); nominated for the first class was Robert A. Goldschmidt (to fill another vacant position created by the board of directors on June 19, 1969). Otherwise, the resolutions passed at the July 1 meeting remained unaltered which meant that Grass and the Windels firm would be drafting the proxy materials to be distributed in conjunction with the upcoming Reconvened 1970 Annual Shareholders Meeting.

## C. *Gray Faction's Drafts of Proxy Materials*

Grass submitted the first draft of a proxy statement to the SEC on August 11, 1971. (PX 32). This forty-four page manuscript was captioned "Scotten, Dillon Company," and pages one through eighteen were de-

voted to a description of the background to *Dillon v. Berg*, the plaintiffs' claims in that case, the Court's opinion and order, and the two meetings of the reconvened board of directors as lawfully constituted on July 22, 1970. Grass' synopsis of the opinion in *Dillon v. Berg* was spiced with quotations that cast an unflattering image of Berg. In a section entitled "The Court's Order," the draft proxy statement mentioned that Judge Latchum had entered *Orders* on June 10, 1971 and July 7, 1971, but ascribed to both *Orders* the contents of only the June 10 Order. Plainly omitted was any explanation of the Gray faction's abortive attempt to increase the membership of the board to fifteen. Indeed, the ensuing section entitled "Steps Taken to Comply With the Court's Order" commenced with the statement that "Pursuant to the aforesaid *Order* of Judge Latchum there was held on July 1, 1971 and July 16, 1971 meetings of the Board of Directors . . . as it was found to exist as at July 22, 1970 . . . It was further determined that the stockholders be requested to set the number of positions at nine on the Board of Directors." (emphasis added). An alert reader attempting to coordinate the time frame of the Court's order with its contents may have wondered why the Court had to provide for two meetings, and considering the previous discussion of Berg, he might well have concluded that the Berg faction had attempted to maneuver around and impede the orderly conduct of the July 1 meeting.

The focus of this first draft of the proxy statement then shifted so as to identify those soliciting the proxy and to discuss briefly Scotten, Dillon's current office holders, directors and major shareholders. A section entitled *Persons Making the Solicitation* noted that

"This solicitation is made by Scotten, Dillon Company at the direction of a majority of the Board of Directors in office on July 22, 1970, as set forth above."

In a section entitled "Remuneration of Directors and Officers" it was disclosed that "The Board of Directors purported to

terminate Mr. Power as President in July, 1970," and that

"The nominees listed above have been informed by Mr. Power that he believes that he has a claim against the Company in respect of the aforesaid termination of the employment contract. The said nominees have advised Mr. Power that if elected they will seek to have the Company review Mr. Power's relationship with it and to meet with his attorney, if requested, for the purpose of seeking a mutually satisfactory disposition of Mr. Power's claim."

Pertinent information was provided in paragraph form concerning Fred R. Davis, among others; the draft indicated that Davis owned 3,100 shares of Scotten, Dillon common stock.

Two parties commented upon the contents of the first draft of the proxy statement. William Lerner, Scotten, Dillon's Secretary and Chairman of the Executive Committee, wrote Grass directly on August 20, 1971. (PX 33). In a brief three page letter he suggested that the proxy statement include the full Court's opinion in *Dillon v. Berg* rather than the summary contained in the draft and that the proxy statement should indicate the total number of shares outstanding in July 1970 and June 1971 as well as the total number of shares entitled to be voted at the Reconvened 1970 Annual Shareholders Meeting.

A lengthier and much more critical exposition (PX 35) was offered by Henry W. Cornell, III, of Berg & Cornell, general counsel to the company. (DX 38D at 191–204). Cornell's letter, dated August 20, 1971, was addressed to Scotten, Dillon Company, 1702 Main Place Tower, Buffalo, New York and was directed to the attention of Ernest Summers, Executive Vice President, who was *not* a member of the board of directors as lawfully constituted on July 22, 1970.[11] Carbon copies of the critique were sent to the SEC, to Skadden, Arps, Slate, Meagher & Flom in New York, counsel for

Scotten, Dillon Company retained in 1971, and to Potter, Anderson & Corroon, in Wilmington.

Cornell's letter had little, if anything, laudatory to state about Grass' first draft of the proxy statement. Salient comments are as follows:

(1) Cornell objected to the caption "Scotten, Dillon Company" on the proxy materials "unless it can be demonstrated that 'management' (within the general meaning ascribed to such term under the 1934 Act) is responsible therefor." He noted that "we are not aware that a majority of the directors of the company have approved or authorized the calling of the [Reconvened 1970 Annual Shareholders] meeting . . . and that this factor must be communicated, clearly and unambiguously, to stockholders within the scope and intent of Rule 14a–4 and 14a–9."

(2) Cornell characterized the summary of the *Dillon v. Berg* litigation as "exceeding the perimeter of fair comment for the deliberate purpose of creating an unfavorable impression of present management [*Berg*] and ignoring the standards of impartiality required under proxy rules." .

(3) Cornell opined that the "persons responsible for preparation" of the first draft of the proxy statement should make a more diligent inquiry as to the identity of 10 percent shareholders of Scotten, Dillon stock because

"We have reasons to believe that C. B. Richard, Ellis & Co., directly and through stock holdings of its partners, customers and associates, are the direct and indirect beneficial holders of more than 10 percent of the Company's outstanding stock; also we believe certain other persons known to persons making the solicitation may be nominees or affiliates of another beneficial holder of more than 10 percent of the Company's outstanding stock."

(4) Cornell recommended that the proxy statement specify the relationship between

---

11. The letter opened with the statement that Berg and Cornell had reviewed Grass' draft, at Lerner's request, in order to advise Scotten,

Dillon whether the draft complied with Section 14(a) of the Securities Exchange Act of 1934.

Windels, Merritt & Ingraham and C. B. Richard, Ellis & Co.

(5) Cornell expressed alarm about the disclosure in the draft proxy statement relative to Ralph Power because nowhere was mention made that the Scotten, Dillon board of directors had voted unanimously on December 9, 1970 to terminate all relationship with Power because of a tobacco inventory loss. In Cornell's view, the Gray faction nominees' agreement to reconsider Power's July 1970 termination as president implicitly, but in a circumlocutory manner nonetheless, entailed an undertaking to hold Power harmless for any aspect of the tobacco inventory loss.

Following these specific comments, near the close of the letter, Cornell returned to the matter of the C. B. Richard, Ellis & Co. "group." It was his suggestion that this "Group" file a Schedule 13(d) in order to comply with Section 13(d) of the Securities Exchange Act of 1934 [12] and that the proxy statement identify the members of the Group and disclose its views concerning and intentions toward Scotten, Dillon business matters.

Grass eventually received a copy of Cornell's letter through the good graces of Potter, Anderson & Corroon, in Wilmington, and responded to same in a letter to the SEC dated September 1, 1971. (PX 38). Before he had the opportunity to do so, however, he submitted a second draft of the proxy statement on August 20, 1971. (PX 34). Highlights of the second draft are:

(1) The proxy statement was still captioned "Scotten, Dillon Company."

(2) The lengthy summary of the *Dillon v. Berg* opinion had not been revised (the unflattering references to *Berg* had been retained).

(3) There was no clarification of what had transpired at the July 1, 1971 and the July 16, 1971 Board of Directors meetings, nor was there any mention of the Court's order of July 7, 1971.

(4) The section entitled "Persons Making the Solicitation" had been reworded and was now the following:

"This solicitation is made by Scotten, Dillon Company pursuant to the Order of the United States District Court for the District of Delaware as set forth above."

(5) A discussion of the proposal to increase the number of directors to nine failed to clarify the events transpiring on July 1, July 7 and July 16, 1971.

(6) The discussion of Power's purported claims against Scotten, Dillon Company and the nominees' position regarding these claims remained unchanged.

(7) Fred Davis was still described as owning 3,100 shares of Scotten, Dillon common stock.

(8) A brief biographical sketch of Harold Gray noted that he was the owner of 10,100 shares of Scotten, Dillon common stock and that he was a "practicing attorney in Miami, Florida."

On August 24, 1971, in accordance with its order of June 10, 1971 retaining supervisory power over Scotten, Dillon's corporate affairs until after the Reconvened 1970 Annual Shareholders Meeting was held, this Court issued an order allowing Scotten, Dillon to institute suit against Ralph Power, James E. Buchen and Lynn E. Tryggestad (the former chief executives of Scotten, Dillon's subsidiary The Wisconsin Tobacco Company) for waste and mismanagement arising out of the loss or disappearance of approximately one million dollars worth of tobacco inventory during the fiscal year

---

**12.** On July 21, 1971, Grass, while meeting with F. Steven Berg in Buffalo, New York, had been informed that Arthur T. McGonigle supposedly owned 2,000 of Davis' 3,100 Scotten, Dillon shares and that McGonigle kept the certificates representing those shares in a Reading, Pennsylvania lockbox. (Docket Item 63 at 423–425). Within a week Grass confronted Davis with this accusation. (Cf. Tr. 147). Davis denied it, replying that he would show Grass the cancelled checks to prove that he had paid for the 2,000 shares. (Docket Item 162 at 557). Grass demurred that this was unnecessary, and he did not inquire of McGonigle or investigate further whether there was any basis in fact underlying Berg's allegation. (Docket Item 162 at 558; Tr. 647).

1970. The order was signed following a hearing on the matter at which the Gray faction, through counsel Richards, Layton & Finger, and through Grass was represented. (Docket Item 63 at 370).

Lerner wrote Grass on August 25, 1971 (PX 36) in order to comment on the second draft of the proxy statement. Although he emphasized that by writing Grass he was not approving the material and that he was relying on Grass for it to be accurate and complete, he stated that the disclosures with respect to Power were inaccurate and "probably misleading." Lerner advised Grass that Power had been retained as president of Wisconsin Tobacco Company until the spring of 1970, when the board learned that Power, who had been in charge of the tobacco warehouse, had not ensured the security of the tobacco and had then failed to report its loss or disappearance. Lerner also noted that he was "disturbed to think that the nominees and possibly Messrs. Gray, Davis and Dillon have an understanding with Mr. Power with regard to his alleged claim because of the termination of his employment contract." Apropos of Gray, Lerner suggested that Gray should be identified as a limited partner of C. B. Richard, Ellis & Co. Finally, Lerner raised the question of whether Windels, Merritt & Ingraham should be identified as C. B. Richard, Ellis & Co.'s general counsel.

On August 27, Grass wrote Lerner in response to the latter's August 25 correspondence. (PX 37). As far as Grass was concerned, "current and correct information concerning the affairs of Scotten, Dillon are known only to the 'insiders' including Messrs. Berg, Bissell, Summers and you," and he referred to two instances where Berg and his faction had wrongfully refused to inform Gray about certain matters. Grass requested that Lerner provide him with a specifically worded and accurate sample proxy disclosure concerning Power and Grass represented that "certainly any . . . review [of Power's claims] would now have to take into consideration those matters which were the basis for your motion to Judge Latchum on Tuesday, August 24, 1971. . . ."

Grass wrote to the SEC on September 1, 1971 (PX 38) providing an item by item detailed explanation of and rebuttal to the points raised in Cornell's letter of August 20. Grass here states that "in respect of Mr. Power's employment contract, the draft proxy material merely reflects that some disposition of his contract would have to be made and the nominees would be willing to review his claim. No promise of any kind has been made nor do the nominees believe that they have the authority to make any such promise."

On September 7 Lerner answered Grass' reply of August 27. (PX 40). He provided a nine line summary of Power's relations with Scotten, Dillon from July 1970 to December 1970; [13] the summary did not specify the amount of the tobacco loss ($936,000).

Also on September 7 the Division of Corporate Finance of the SEC offered comments (PX 41) on the second draft of the proxy statement. (PX 34). There was an opening admonition that the proxy statement and form of proxy "should appropriately state in bold type at the top that the solicitation is *by a majority of the July 22, 1970 board.* Any reference or implication throughout the rest of the proxy material that proxies are being solicited by management or the company should also be deleted." (emphasis added). Among information which the Commission desired be added was the designation of the two nominees who would be elected if the proposal to increase the board of directors to nine members failed to garner a majority vote at the Reconvened 1970 Annual Shareholders

---

13. "The Board of Directors terminated Mr. Power as President of the Company in July 1970; Mr. Power continued as an employee of the Company and as President of Wisconsin Tobacco Company, a wholly-owned subsidiary until December 1970, when he was terminated as an employee of the Company and as an officer and employee of Wisconsin Tobacco Company, following the disclosure of the tobacco inventory loss at Wisconsin Tobacco Company reported by the Company in the Annual Report for the fiscal year ended December 31, 1970."

Meeting. Under the section denoted "Remuneration of Directors and Officers" (pages 29–31 of the second draft of the proxy statement) Grass was directed to expand the discussion of Power's claims against Scotten, Dillon so as to inform shareholders that Scotten, Dillon "had filed a complaint against Ralph R. Power and others in the United States District Court for the Western District of Wisconsin alleging waste, mismanagement and conversion of certain assets of the corporation." The SEC requested to be advised of the number of Scotten, Dillon shares owned by partners, other associates, and customers of C. B. Richard, Ellis & Co., and since in its view the Gray faction's proxy solicitation would be "contested," the SEC reminded Grass that Schedule 14B's would have to be filed by each person deemed to be a "participant" in the "election contest."

On September 9, 1971, Berg, Morris Himmel, W. Dennis Prouty and Summers formally indicated (PX 42) to the Division of Corporation Finance of the SEC that they intended to contest the Gray faction's proxy solicitation effort for the upcoming Reconvened 1970 Annual Shareholders Meeting.

Gray submitted a third draft of the proxy statement to the SEC on September 13, 1971. (PX 43). This draft incorporated almost verbatim Lerner's suggested passage describing Ralph Power. In his accompanying letter, Grass noted that "we know of no contest involving this solicitation and at this point do not consider it a contested solicitation." [14] He provided the following response to the SEC's inquiry concerning C. B. Richard, Ellis & Co.'s ownership of Scotten, Dillon shares:

"*We have been advised by C. B. Richard, Ellis & Co., that it holds 1,000 shares of the common stock of Scotten, Dillon of record and beneficially; 100 shares for Harold Gray and 700 shares for Robert M. Schroder. Finally, it holds in safe-*

keeping for Mrs. Phyllis Briggs 19,150 shares."

(PX 43 at 4) (emphasis added).

On September 20 Berg & Cornell reentered the dialogue between Grass and the SEC. Once again Henry Cornell did not forward Grass a carbon copy of this second letter to the SEC, (PX 44) but now Cornell explicitly represented that Berg & Cornell was "acting on behalf of the directors of Scotten, Dillon Company who intend to oppose the proposals contained in the revised proxy material that had been submitted by Grass on September 13, 1971," viz., Messrs. Berg, Bean, Bissell, Lerner, Prifti and Summers. Cornell's primary criticisms are the following:

(1) The proxy card should be redesigned in order to allow shareholders to vote for any two of the four Gray faction candidates if the proposal to increase the board to nine members failed to pass.

(2) The meeting notice should not contain the subscription "Scotten, Dillon Company."

(3) The "lengthy, verbose and bias[ed] discussion of the background of the [*Dillon v. Berg*] lawsuit should be modified at a minimum to explain that in November 1970 the management [Scotten, Dillon] discovered a $1 million loss or disappearance of assets, that since then the cooperation of Gray, Dillon and Davis has been half hearted in investigating the circumstances surrounding the loss or disappearance, and that Power may still be claiming a right to his directorship and presidency. . . ."

(4) The proxy statement should discuss the Gray faction's abortive attempt to increase the board's membership to 15.

(5) Regarding Davis, Cornell wrote:

"We recommend that the Commission obtain supplementally information documenting the 'ownership' of the amount of shares recited. The Company has received information that Davis is holding all, or a substantial part of such shares,

---

14. Grass also discussed the effect of this Court's ruling on August 24, 1971 that holding the Reconvened 1970 Annual Shareholders Meeting in no way would prevent the Berg

faction from attempting to convene a "1971" Special Shareholders Meeting, if as Scotten, Dillon bylaws permitted, the Berg faction could obtain consent of 50% of the shareholders.

as a nominee for an undisclosed principal."

(PX 44 at 10, item 33).

Not content to await the outcome of the Reconvened 1970 Annual Shareholders Meeting before actively pursuing his claim for breach of contract against Scotten, Dillon, on September 30, 1971 Power caused a writ of attachment to be issued against the Wisconsin Tobacco Company's plant in Viroquia, Wisconsin. (Docket Item 63 at 415; Docket Item 162 at 549). Early in the morning of October 1, Richards, Layton & Finger, the Gray faction's Delaware counsel, was informed of the seizure by Potter, Anderson & Corroon, Scotten, Dillon's Delaware counsel (Docket Item 162 at 550, Tr. 72) and Grass was immediately notified by Richards, Layton & Finger. However, before Grass could consult with Gray, Davis or Dillon about this matter, Potter, Anderson & Corroon informed Richards, Layton & Finger that the Gray faction's assistance was unnecessary and Grass did not thereafter attempt to verify whether Power had in fact seized the plant or attempt to ascertain why Power had done so (Docket Item 162 at 552), only learning some details either a week later in casual telephone conversations [15] with Power (Docket Item 152 at 114–115; Docket Item 63 at 350) or after the institution of the lawsuit captioned *Abraham v. Gray*, et al. in late October 1971. (Docket Item 1).

Also on October 1 the SEC forwarded Grass additional comments about the draft proxy materials, specifically directing that the proxy statement "should disclose the Dillon group's intentions as to the law suit brought by the company against Power." (DX 19 at 2).

On October 4 Grass submitted a revised draft of the proxy materials. (PX 51). Of interest in this proxy draft is a noticeable embellishment on the theretofore brief section in tabular format entitled "Information Concerning Nominees for Director." Appended to this section were the following statements:

"Neither have any of the nominees been within the past year a party to any contract, arrangement or understanding with any person with respect to any securities of the Company. . . . Each of the above statements applies as well to Len J. Dillon, Fred R. Davis, Harold Gray and Ralph R. Power, who participated as directors of the Company at the Directors' meetings held on July 1 and July 16, 1971 pursuant to Judge Latchum's order described elsewhere herein, except that in June 1969, Harold Gray purchased 10,000 shares of the Company's common stock with funds borrowed from a personal acquaintance, which loan is still outstanding.

\* \* \* \* \* \*

. . . [Windels, Merritt & Ingraham] represents the plaintiffs in *Dillon v. Berg* . . . , the action instituted by Messrs. Dillon and Davis . . . and in connection with the 1970 reconvened meeting of shareholders.

Messrs. Dillon, Davis and Gray intend to seek reimbursement from the Company for disbursements and reasonable attorneys fees incurred and expended in connection with their prosecution of *Dillon v. Berg*, including appeals. Among the firms to which such legal fees would be payable is Windels, Merritt & Ingraham.

\* \* \* \* \* \*

At the meeting on July 1, 1971, of the Board of Directors of the Company pursuant to the Order of the U.S. District Court, District of Delaware the firm of Windels, Merritt & Ingraham was engaged as special counsel for the purpose of preparing this proxy material and in connection with the contemplated special meeting. Said firm expects to be com-

---

15. According to Henry Cornell, Wisconsin counsel for Scotten, Dillon was able to obtain a temporary order returning possession to the plant manager late in the day on October 1. The order was returnable on October 8, but on that date, the Wisconsin court denied motions made by the company and by Power, the result being that Scotten, Dillon retained possession of the plant. (Tr. 73).

pensated by the Company for the reasonable value of its legal services rendered in that regard."

On October 4 the SEC informed Grass that it had no further comments regarding the proxy materials. The next day Grass wrote Lerner, advising him that the Reconvened 1970 Annual Shareholders Meeting was to be scheduled for October 27, 1971. (PX 53).

D. *Final Proxy Statement*

Highlights of the twenty-one page proxy statement, as finally printed, issued and distributed to shareholders, are these (PX 8):

(1) The front page, which gave notice of the meeting, was headed in bold face capitals SCOTTEN, DILLON COMPANY and was signed in large and small capitals "Scotten, Dillon Company."

(2) Near the top of page one the following caption appeared: "This Solicitation Has Been Authorized by a Majority of the Directors of the Company in Office on July 22, 1970."

(3) In the "Background Section" on page one, Harold Gray was termed "the largest single stockholder then [July 22, 1970] on the Board."

(4) On page 3 the section entitled "The Court's Opinion" opened with the statement that "[t]he Court's Opinion held, among other things, that the covert agreement giving Berg power to remove Power at any time and without cause was void and unenforceable under Delaware law." Also excerpted from the Court's opinion in *Dillon v. Berg* were passages such as, "Berg's obtaining Power's undated resignation was done on his own behalf and in his own interest and not as an agent of the corporation. . . . To allow the removal of one director, without cause, by another director through the vehicle of obtaining a secret, undated resignation as a *quid pro quo* for allowing an uncontested reelection to the Board is an even more serious violation of Delaware law. . . . As a consequence, the designation of the proxy materials, drawn up only by Berg and the members of

his faction and not authorized by the Board, cannot be regarded as 'management.' . . ."

(5) On page 5 in the section entitled "Steps Taken to Comply With Court's Order" there was no mention of the Court's July 2 and 7 orders nullifying the resolution passed on July 1 that had been designed to expand the membership of the board to fifteen directors.

(6) On page 6, the section entitled "Persons Making the Solicitation" read:

"This solicitation is made pursuant to the Order of the United States District Court for the District of Delaware as set forth above."

(7) On page 8 in the section entitled "Voting Securities and Principal Holders Thereof" it was noted that according to the records of Scotten, Dillon's transfer agent, no one person owned of record more than 10% of the shares entitled to vote at the Reconvened 1970 Annual Shareholders Meeting.

(8) On page 10, the third entry in the "Recent Developments Section" was this sentence:

"In August 1971, the Company instituted an action against Ralph R. Power and others in (sic) United States District Court for the Western District of Wisconsin alleging waste, mismanagement and conversion of certain assets of the Company in connection with a tobacco inventory loss reported by the Company in its Annual Report for the fiscal year ended December 31, 1970."

However, the amount of the inventory loss ($936,000) was disclosed approximately midway through the annual report enclosed with the proxy statement, in a section entitled "Scotten, Dillon Company and Subsidiaries Notes to Consolidated Financial Statements December 31, 1970," and in another section entitled "Opinion of Independent Accountants." (PX 9). The existence of a "substantial" tobacco inventory loss was also referred to at the beginning of the annual report in Part I, Item 1 (Business (b)(3)).

(9) On page 13 of the proxy statement, in the section entitled "Election of Directors," the stockholders were informed that if they did not vote to expand the board to nine, then Messrs. Baratelli and Grass would be nominated to replace Messrs. Power and Bissell in the two positions on the seven man board of directors that were to be filled as a matter of course.

(10) On pages 14–15, about two-thirds of the way through the proxy statement, there appeared a section entitled "Information Concerning Nominees for Directors."

With respect to each nominee there was presented in tabular fashion (1) the number of shares of Scotten, Dillon common stock he beneficially owned as of September 1, 1971, and (2) his principal occupation. The portion of the table focusing on Grass did reveal that he was a partner with Windels, Merritt & Ingraham and that the Windels firm represented the plaintiffs in *Dillon v. Berg*, but no mention was made of its long-standing representation of C. B. Richard, Ellis & Co.

Below the tabular information there were five paragraphs which included these two references:

(a) "In June, 1969 Harold Gray purchased 10,000 shares of the Company's common stock with funds borrowed from a personal acquaintance, which loan is still outstanding."

(b) "At the meeting on July 1, 1971, of the Board of Directors of the Company pursuant to the Order of the U.S. District Court, District of Delaware the firm of Windels, Merritt & Ingraham was engaged as special counsel for the purpose of preparing this proxy material and in connection with the contemplated special meeting."

(11) The section entitled "Information Regarding Directors and Others," stretching from pages 16 to 21 of the proxy statement, provided information about S. Geyer Bean, Berg, Bissell, Davis, Dillon, Gray, William Lerner, William M. Prifti, Power and Summers. Samplings from this section include the following:

(a) Fred Davis was described as "the owner, as at September 1, 1971 of 3,100 shares of the Company's Common Stock, all of which are entitled to one vote each at this Special Stockholders Meeting."

(b) Harold Gray was described as "the owner of 10,100 shares of the Company's Common Stock as at September 1, 1971, each of which is entitled to one vote at this Special Shareholders Meeting. . . . Since 1955, Mr. Gray has been a practicing attorney in Florida with a present business address of P.O. Box 347, Miami, Florida. . . . Mr. Gray is also a limited partner of C. B. Richard, Ellis & Co., New York, New York, a member firm of the New York Stock Exchange."

(c) Regarding Power, these assertions were made:

". . . The Board of Directors *attempted to terminate* Mr. Power as President of the Company in July 1970; Mr. Power continued as an employee of the Company and as President of Wisconsin Tobacco Company, a wholly-owned subsidiary, until December 1970, when he was *sought to be terminated* as an employee of the Company and as an officer and employee of Wisconsin Tobacco Company, following the disclosure of the tobacco inventory loss at Wisconsin Tobacco Company reported by the Company in the Annual Report for the fiscal year ended December 31, 1970."

\* \* \* \* \* \*

". . . In December 1970 Mr. Power was the record owner of an additional 5,000 shares of the Company's common stock which the Company *sought to cancel* on the books of its transfer agent. . . ." (emphasis added).

Finally, came this crucial paragraph:

"The nominees listed herein have been informed by Mr. Power that, although he has not formally notified the Company, he believes that he has a claim against the Company for unpaid compensation in

respect of the aforesaid termination of the employment contract and the attempted cancellation of his 5,000 shares of common stock. The said nominees have advised Mr. Power that if elected they will seek to have the Company review Mr. Power's relationship with it and to meet with his attorney, if requested, for the purpose of seeking a mutually satisfactory disposition of Mr. Power's claims. See also 'Recent Developments' for a discussion of certain litigation instituted by the Company against Mr. Power. In connection with the litigation instituted by the Company against Mr. Power as described in 'Recent Developments' the nominees hereby undertake that if they are elected and such litigation is still pending at the time of their election they will seek the advice and recommendation of independent counsel as to the merits of such litigation. They further undertake that they will seek court review and approval of any disposition which such independent counsel may advise or recommend."

(12) The proxy statement closed with the subscription (in large and small capitals) "Scotten, Dillon Company."

### E. *Proxy Card*

The proxy card (PX 7) accompanying the proxy statement also had a curious format. To begin with, the third line of its heading contained the same language at the top lines of page one of the proxy statement, viz., "This solicitation has been authorized by a majority of the directors of the Company in office on July 22, 1970." The front of the proxy card had been designed to permit a shareholder (1) to vote for or against the proposal to expand the board of directors to nine and (2) to vote for or against the *entire* Gray faction slate of four nominees. However, by virtue of this design a shareholder was denied the option to specify which two of the four nominees he desired to cast his vote for should he choose to vote against the proposal to increase the board from seven to nine directors or should the proposal fail to pass at the reconvened shareholders meeting. (Docket Item 163 at

695). On the reverse side of the proxy card a shareholder was warned, somewhat ambiguously, that "if no choice is specified" his proxy (once the proxy card was properly signed) would be voted in favor of the proposal to expand the board to nine and for "the slate of directors proposed by a majority of the Board of Directors of the Company in office on July 22, 1970."

### F. *The Reminder Notice*

On October 18, 1971 the Gray faction mailed a one page reminder notice to those shareholders who had not yet responded to the proxy solicitation. (PX 10). This notice was both captioned and signed "Scotten, Dillon Company." The reminder notice impressed upon the reader the fact that since many Scotten, Dillon shares eligible to vote at the meeting were held in small amounts, his signed proxy would be helpful. This reminder letter had been cleared with the SEC. (Docket Item 63 at 252–254).

### G. *Schedule 14B's*

Because of the formal notification given to the SEC by Berg, Himmel, Prouty and Summers that they intended to contest the Gray faction's proxy solicitation (PX 42) Grass advised the directors on the July 27, 1970 board of directors and the four nominees to file Schedule 14B's. The following disclosures from the Schedule 14B's subsequently filed are pertinent:

Gray's Schedule 14B filed on September 18, 1971 discloses that he "owned beneficially" 10,100 shares of Scotten, Dillon common stock, that in June 1969 he had "purchased 10,000 shares of common stock," that "the funds used to purchase these shares were borrowed from P. M. Hill, a personal acquaintance," and that "this loan is still outstanding." (PX 21).

Fred Davis' Schedule 14B, also filed on September 18, indicates that he owned beneficially 3,100 shares of Scotten, Dillon common. (PX 25). However, subsequently on October 22, 1971, Davis hastily filed an amended Schedule 14B which disclosed that he owned beneficially only 1,100 shares of Scotten, Dillon common and that 2,000

shares were owned of record but not beneficially. (PX 26).

Davis was prompted to confer with Grass after meeting in mid-October 1971 in Reading, Pennsylvania with his old friend William Knauer and with John Russell. Davis now feared that Russell or McGonigle or Berg would sue him for violation of the securities laws since Russell apparently knew that Knauer was the beneficial owner of 2,000 of Davis's shares. (Tr. 178, 112–113 160–161, 178–179). Throughout the summer of 1971 Davis had been aware of the difference between beneficial and record ownership of stock (Tr. at 145; Docket Item 122 at 71; PX 25, item 2(c) ), but had lied to Grass when Grass confronted him in late July with the accusation that McGonigle owned some or all of Davis' 3,100 shares.[16] When Grass finally learned the truth concerning Davis' record ownership of 2,000 of his 3,100 shares (Tr. 645; Docket Item 162 at 541–544, 555), Grass did not see fit to attempt to amend the portion of the proxy statement disclosing Davis' beneficial ownership of 3,100 shares or to notify the Court of this matter. (Tr. 645, 648–650, 652; Docket Item 163 at 582–584). Grass' approach was that securities law (Regulation 14A) required disclosure in the proxy statement of beneficial owner of shares held of record by a nominee and Davis was not a nominee. However, the amended Schedule 14B still failed to disclose the beneficial owner of the 2,000 shares.

### H. Input of Gray Faction Nominees To Proxy Materials

Before discussing liability for various misstatements in the proxy materials, it is necessary to consider the input Grass received from the Gray faction nominees and directors.

*Charles A. Baratelli.* Baratelli never authorized anyone to speak with Power on Baratelli's behalf with regard to Power's

claim for breach of contract (Tr. 431, 444; Docket Item 138 at 27) nor was he informed either by Power or Davis about the nature of Power's claims or any possible settlement of them. (Tr. 443; Docket Item 138 at 27, 30). Moreover, he made no promises directly or through an agent concerning review of Scotten, Dillon's lawsuit against Power. Thus, the representations on page 20 of the proxy statement are false with respect to Baratelli.[17] Baratelli concedes that he received some, but not all, of the four drafts of the proxy statement (Tr. 438; Docket Item 138 at 31), and that he was not very careful in his review.

*Harold Gray.* Grass acknowledges that at least since June 1971 he has been aware of the combined lawyer-client and debtor-creditor relationship existing between Gray and Phyllis Joan Mandary Briggs Hill. (Tr. 687–688; Docket Item 163 at 608). For a period of the same duration he further concedes that he has been aware that there is a "note outstanding" between Gray and Hill. (Docket Item 163 at 612, 606–608). However Grass contends that he first learned of the specific, more predatory terms of the Gray-Hill "borrowing" transaction in December 1974, at Hill's and Gray's depositions in Florida taken in connection with this lawsuit. (Tr. 691–692). Gray maintains that in September 1971 he informed Grass of the specifics of his "borrowing" transaction with Hill, when he and Grass filled out Schedule 14B's (Tr. 572) and that Grass has been aware of the unique Gray-Hill combined lawyer-client and debtor-creditor relationship since August 1970 when Gray retained Grass in connection with the *Dillon v. Berg* lawsuit. (Tr. 572).

*Fred Davis.* Davis concedes that in July 1971 he lied to Grass about his record ownership of 2,000 shares of Scotten, Dillon common stock on behalf of William Knauer. And, despite Grass' request, Davis did not consult with either Goldschmidt or Baratelli

16. See note 12 *supra.*

17. Grass had requested Davis to fully inform Baratelli about Power's contentions, the position the nominees should take regarding these

contentions, and about Scotten, Dillon's lawsuit against Power. (Tr. 740; Docket Item 162 at 518). Grass assumed that Davis had carried out his request and that Baratelli would read each draft of the proxy statement. (Tr. 739).

in order to acquaint them with Power's claims against Scotten, Dillon or with Scotten, Dillon's lawsuit against Power, or to obtain their assent to the representation in the proxy statement that once elected the Gray faction nominees would review these matters. (Docket Item 162 at 519, 514–523; Tr. 740; Docket Item 161 at 30–33).

*Robert Goldschmidt.* Robert Goldschmidt never discussed with Power or his representative either Power's claims against Scotten, Dillon or its lawsuit against him. Goldschmidt never authorized anyone to speak with Power or Power's representative on his behalf regarding these matters. (Docket Item 161 at 30–33). He also does not recall reaching an agreement with the other nominees that once elected they would seek the advice of independent counsel. (*Id.*) Nevertheless, Goldschmidt made no attempt, in so far as the record reflects, to correct these misstatements in the proxy materials.

*Len J. Dillon.* There is nothing in the record regarding his participation in the preparation of the proxy materials for the Reconvened 1970 Annual Shareholders Meeting or regarding his knowledge of the facts underlying the Gray-Hill transaction, Davis' record ownership of 2,000 shares, or potential litigation between Scotten, Dillon and Power. However, Dillon was present at both meetings of the board as lawfully constituted on July 22, 1970, held on July 1 and July 16, 1971, respectively.

*Robert M. Schroder.* Schroder, who now lives in Beruit, Lebanon, resigned as a general "back office" partner of C. B. Richard, Ellis & Co. on August 1, 1972. (Tr. 229). His deposition was not taken in this case; however the record does show that in late summer 1971 Grass informed him of the nature of Power's claims against Scotten, Dillon and of the Company's lawsuit against Power. (Docket Item 63 at 317; Docket Item 162 at 518–519).

## II. THE LAW

The recapitulation of the aforementioned facts makes it evident that the Scotten, Dillon Reconvened 1970 Shareholders Meeting was a struggle for control between the Gray and Berg factions. In such a charged atmosphere the admonitions of Rule 14a–9, issued pursuant to Section 14(a) of the Securities Exchange Act of 1934, are the initial tool for analyzing the Gray faction's proxy materials. Rule 14a–9 provides:

"No solicitation shall be made by means of any proxy statement, form of proxy notice of meeting or other communication . . . containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

There are three predicates to the establishment of a violation of Rule 14a–9. First, the false or misleading statement or the omission must be found to have been "material." Second, those individuals participating in the proxy solicitation must be found to have satisfied some degree of culpability or fault. Third, the proxy solicitation must have been an essential link in the accomplishment of the transaction. *Mills v. Electric Auto-Lite,* 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Epic Enterprises, Inc. v. Brothers,* 395 F.Supp. 773, CCH Secur.L.Rep. ¶ 95,289 (N.D.Okl.1975). *Gould v. American Hawaiian Steamship Co.,* 351 F.Supp. 853 (D.Del.1972), *aff'd in relevant part,* Nos. 75–1338 and 75–1339 (C.A.3, April 8, 1976).

(1) The definition of "material" under Rule 14a–9 has evolved somewhat since the seminal decision of the Supreme Court in *Mills v. Electric Auto-Lite,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). There, the Court remarked:

"Where the misstatement or omission in a proxy statement has been shown to be 'material,' . . . that determination itself indubitably embodies a conclusion that the defect was of such a charac-

ter that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote. This requirement that the defect have a significant *propensity* to affect the voting process is found in the express terms of Rule 14a–9, and it adequately serves the purpose of ensuring that a cause of action cannot be established by proof of a defect so trivial, or so unrelated to the transaction for which approval is sought, that correction of the defect or imposition of liability would not further the interests protected by § 14(a)." (emphasis in the original).

■ This passage in *Mills* spawned a debate over the governing definition of "material". *Compare, Northway, Inc. v. TSC Industries, Inc.,* 512 F.2d 324, 331 (C.A.7, 1975), cert. granted, 423 U.S. 820, 96 S.Ct. 33, 46 L.Ed.2d 37, 44 U.S.L.W. 3200 (1975) *with Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1302 (C.A.2, 1973). But the Third Circuit has now adopted the view of the Second Circuit, holding in *Gould v. American-Hawaiian Steamship Co.,* Nos. 75–1338 and 75–1339 (C.A.3, April 8, 1976) (Maris, Van Dusen & Hunter, J.J.), slip opinion at page 14 that

"The basic test of materiality in a section 14(a) setting is whether it is probable that a reasonable shareholder would attach importance to the fact falsified, misstated or omitted in determining how to cast his vote on the question involved. Or . . . whether 'taking a properly realistic view, there is a substantial likelihood that the misstatement or omission may have led a stockholder to grant a proxy to the solicitor or to withhold one from the other side, whereas in the absence of this he would have taken a contrary course.'"

*See also in accord, Ash v. LFE Corp.,* 525 F.2d 215, 218 (C.A.3, 1975) (Gibbons, Aldisert & Weis, JJ.); *Mayer v. Development*

*Corp. of America,* 396 F.Supp. 917, 927 (D.Del.1975).[18]

■ (2) The standard of fault imposed upon a defendant under Rule 14a–9 is for his negligent conduct or lack of due diligence. *Gould v. American-Hawaiian Steamship Co.,* Nos. 75–1338 and 75–1339 (C.A.3, April 8, 1976), slip op. at 27–28. Establishment of liability according to this standard invokes a two step process. See *Gould,* 351 F.Supp. at 865–866. First, it must be shown that, considering his particular position in or with respect to the corporation, a director or nominee (or any other person who solicits or permits the use of his name to solicit a proxy) knew or should have known that a "material" statement in proxy documents was false or misleading or that he knew or should have known that the omission of certain "material" information made the proxy documents false or misleading. Next, the nature of the "material" defect must be considered. If the defect is a false or misleading affirmative statement or if it is an omission which renders false or misleading another affirmative statement in the proxy documents then an individual is liable without regard to his knowledge or belief as to the materiality of the statement or omission. On the other hand, if the omission concerns a subject about which the proxy documents are completely silent and the noninclusion of which does not render misleading an affirmative statement which is contained in the proxy documents, then an individual must be found to have known of the subject's probable importance to a shareholder contemplating how to cast his vote or it must be found that he ought to have known of this probable importance. 351 F.Supp. at 866.

■ (3) The Court finds that the proxy statement, proxy card and reminder letter were essential links in achieving the election at the Reconvened 1970 Annual Shareholders Meeting of the four Gray faction

18. A proxy statement also may violate Rule 14a–9 if it contains numerous misstatements or is characterized by numerous omissions which are "material" in the aggregate even though each individual misstatement or omission is not "material" within the definition of "material" as articulated by the Third Circuit in *Gould v. American-Hawaiian Steamship Co.* See *Gould,* 319 F.Supp. 795, at 809 (D.Del.1970); *Dillon v. Berg,* 326 F.Supp. 1214, 1234 (D.Del.1971).

nominees to the Scotten, Dillon board.[19] The Gray faction directors held 16,450 shares of record entitled to vote at this meeting. (PX 8 at 18 [Davis, Dillon, Gray] and at 20 [Power]). Addition of the shares entitled to vote held by the nominees Goldschmidt, Schroder, Baratelli and Grass (PX 8 at 14) brings the total Gray faction voting strength to 18,500; further inclusion of the 19,150 eligible shares held of record by defendant Hill (Docket Item 180, Pre-trial Order, entry c(7)) and of the 1,000 eligible shares held by C. B. Richard, Ellis & Co. (PX 8 at 14), results in a total of 38,850 shares. Since this sum falls short of the 54,541 share total necessary to elect the Gray faction slate of four nominees, *Standard Power & Light Corp. v. Investment Associates*, 29 Del.Ch. 593, 51 A.2d 572 (Sup. Ct.1947), the preceding arithmetical exercise bears out the fact that the proxy documents were the requisite essential link. See *Mills v. Electric Auto-Lite*, 396 U.S. at 385 n. 7, 90 S.Ct. 616; *Ash v. LFE Corp.*, 525 F.2d 215, 217 n. 2 (C.A.3, 1975).

At this juncture, the Court will identify the material defects in the proxy materials and assign responsibility for them.

### III. THE PROXY STATEMENT VIOLATIONS

#### A. Disclosures Concerning Ralph Power

Power stands out as a central character in the genesis of the *Dillon v. Berg* suit, and his restoration to his directorship retroactive to July 22, 1970 was not only the pivotal aspect of this Court's order dated June 10, 1971 but also marked the renewal of his participation in Scotten, Dillon affairs following his dismissal as President of the Wisconsin Tobacco Company by the Berg-dominated Scotten, Dillon board of directors in December 1970. This much the Gray faction's proxy statement makes clear. However, since *Dillon v. Berg* had been waged by dissident directors, not ordinary

shareholders, it was apparent to a shareholder possessing minimum investment acumen and pondering the situation in the summer and fall of 1971 that one further result of the *Dillon v. Berg* lawsuit was that the actions taken by Scotten, Dillon management on or after August 22, 1970, might be subject to question and review by the lawful board of directors presiding after the Reconvened 1970 Annual Shareholders Meeting. In this uncertain atmosphere, complete, continuing and detailed disclosure of Power's actions following his dismissal and of the relationship between Gray, Dillon, Davis and Power was indispensable to reasoned consideration of the results of the two meetings of the reconvened board in which Power participated and of the major problems that appeared likely in attempting to rescind some of the decisions reached and then implemented by the Berg-dominated board after August 22, 1970, including Power's dismissal in December 1970. Also, disclosure of the Gray faction nominees' individual or collective opinion of or reaction to this state of affairs was of the utmost importance. See *Chris-Craft Industries, Inc. v. Independent Stockholders Committee*, 354 F.Supp. 895, 914 (D.Del.1973). Anything less would deprive shareholders of the full gamut of information required to permit the exercise of informed corporate suffrage, which right the plaintiffs in *Dillon v. Berg* had championed successfully.

█ The proxy statement is thus defective in this respect because of a combination of misstatements and omissions:

█ First of all, the proxy statement affirmatively misleads the shareholders in stating on page 20 that Power had informed the nominees of his claims against Scotten, Dillon and that they in turn had advised him that, if elected, they would seek to review these claims. The record is clear that two of the nominees, Goldschmidt and Baratelli, were not so informed nor did

---

**19.** There were 216,216 shares entitled to vote at the meeting (PX 8 at 7) but shareholders "representing" only 14,300 of these shares were present in person (Gray-10,100; Schroder-700; Dillon-3,100; Martin Glotzer-400) (PX 16 at 7) and according to Article III, Section 4 of the Scotten, Dillon by-laws, a quorum is established by the presence of shareholders representing one-half of the issued and outstanding shares entitled to vote. (PX 11; *Italo Petroleum Corp. of America v. Producers' Oil Corp. of America*, 20 Del.Ch. 283, 174 A. 276 (1934)).

they so advise Power. Therefore, Baratelli and Goldschmidt are liable for knowingly subscribing to these false statements, as is Davis, who failed to convey to them the gist of discussions with Power as had been requested by Grass. Grass and Schroder are liable for having negligently subscribed to these misstatements since the passage on page 20 portrays a collective notice to and undertaking by all four of the Gray faction nominees. Grass and Schroder apparently were informed of Power's claims and somehow advised Power of his intent to reconsider these matters if elected,[20] but in view of the wording of the passage on page 20, each was obligated to ensure that the other three nominees had as much knowledge as he did.[21] Gray, Davis and Dillon are liable in two capacities. First, as plaintiffs in *Dillon v. Berg* they were under an obligation imposed by the Court's order of June 10, 1971 to ensure that statements in the proxy were accurate; their negligence was manifest in failing to verify the accuracy of as important a statement as collective acknowledgment of the nominees that Power, the deposed president of Scotten, Dillon, had communicated with them and that they had advised him of their intentions. (In point of fact, Gray himself had made these representations to Power). Second, as directors supporting the proxy solicitations Dillon, Davis and Gray were obligated to exert a reasonable effort to ensure the accuracy of the proxy statement.[22]

■ Second, there is the matter of Power's seizure of the Wisconsin Tobacco Company warehouse in Viroqua, Wisconsin on September 30, 1971. This seizure is material in that its omission makes misleading the statement at page 20 that Power believes he has a claim against the Company for breach of contract "although he has not formally notified the Company" and fur-

ther colors the character of the nominees' collective undertaking. While this summary seizure is not a written communication with Scotten, Dillon, it certainly constituted an attempt to put the Company on formal notice of his claim. And the "bona fides" of the nominees' fictitious collective undertaking to review Power's "claim" would become even more important to the reasonable shareholder who was informed that Power's grievance had been transformed from a possible subject of negotiation into a cudgel used in an initial legal skirmish with Scotten, Dillon. The record is clear that on or about September 30, 1971 Grass learned of Power's seizure of the Wisconsin Tobacco Company warehouse, but he did not vigorously attempt to investigate the surrounding circumstances. Because of his negligence, he is liable for this material misstatement.

■ The third material defect consists of the obscure manner in which the $936,000 tobacco inventory loss was disclosed. The fact that Power and others had been sued by Scotten, Dillon in August 1971 for a $936,000 tobacco loss was segmented into three different parts each presented in a different place in the documents provided shareholders in connection with the proxy solicitation: (i) the fact that Power had been sued, on page 20 in the "Ralph R. Power" section; (ii) the fact that the suit was on account of the tobacco inventory loss, on page 10 under "Recent Developments," and (iii) the fact that the loss was $936,000, not in the proxy statement at all, but buried in two pages of the forty page accompanying "Financial Statement," which page 10 of the proxy statement referred to as "Annual Report For The Fiscal Year Ended December 31, 1970" without specifying page numbers on which the amount of the loss could be found. Disclo-

---

**20.** The record is unclear, however, as to whether Schroder was aware of the lawsuit instituted in August 1971 by Scotten, Dillon against Power and others on account of the $936,000 tobacco inventory loss.

**21.** For example, the use of the verb "advised" implying direct communication with Power or

indirect communication through Power's agent, should have put Grass and Schroder on notice.

**22.** Since the misstatement was affirmatively misleading, the Court need not consider the defendants' awareness of its materiality. Gould, *supra*, 351 F.Supp. at 866.

sure of the suit for a $936,000 loss, even in this disembodied form, testifies to the importance of informing the shareholders of the character of one of the directors voting in favor of the proxy solicitation for the reconvened shareholders meeting and of one of the major problems the nominees elected at the Reconvened 1970 Annual Shareholders Meeting would face, viz., whether to expend further company monies in an attempt to recover some or all of the loss from Power. Also, the nominees "undertaking" could not be intelligently assessed without disclosure of the $936,000 inventory loss. There was a substantial likelihood that in this case a reasonable shareholder, in studying the total 80 pages of the proxy statement and financial statement would fail to correlate the Company's suit with the fact and amount of the tobacco loss. Thus, it was imperative that the proxy statement compactly and clearly disclose this matter. Grass, who was aware of the suit and who was primarily responsible for drafting the proxy, is liable for this misleading portion of the proxy materials. *Accord, Gould v. American-Hawaiian Steamship Co.*, No. 75–1338 and 75–1339 (C.A.3, April 8, 1976), slip op. at 20–21; *See Ash v. LFE Corp.*, 525 F.2d 215, 219 (C.A.3, 1975).

█ Finally, there is the matter of the nominees' collective undertaking to seek the advice and recommendation of independent counsel regarding the merits of Scotten, Dillon's suit against Power for the tobacco inventory loss. Neither Goldschmidt nor Baratelli was aware of such undertaking, while Grass and Schroder did not take adequate steps to confirm or discover Baratelli's and Goldschmidt's ignorance. Thus, the four nominees are liable for this misstatement as are Davis, Gray and Dillon for their failure to inquire of each nominee regarding the undertaking.

B. *Disclosures Concerning Harold Gray*

Gray was one of the plaintiffs in *Dillon v. Berg* and a director of Scotten, Dillon who had approved the proxy solicitation for the Reconvened 1970 Annual Shareholders Meeting. In addition, his term of office would expire at the conclusion of the lawful 1972 annual shareholders meeting; as such he would be sitting on the lawful expanded Scotten, Dillon board along with the four nominees whom he hoped would be elected at the Reconvened 1970 Annual Shareholders Meeting. Thus, his allegiance and expectations as a director and as victorious plaintiff, as well as the source of his shareholdings, were of interest to Scotten, Dillon shareholders in considering how to vote at the Reconvened 1970 Annual Shareholders Meeting.

█ There are two portions in the proxy statement where there are affirmatively misleading material statements concerning Gray. The first is at page one; here Gray is touted as being the "largest single stockholder" on the Scotten, Dillon board as of July 22, 1970. Much further on, at page 15, there appears in a section entitled "Information Concerning Nominees for Director" a discussion of the circumstances surrounding his acquisition of 10,000 of his 10,100 shares of Scotten, Dillon common.

Turning initially to the second portion, there is no question but that the statement that,

"In June, 1969, Harold Gray purchased 10,000 shares of the Company's common stock with funds borrowed from a personal acquaintance, which loan is still outstanding,"

is false and is also affirmatively misleading for failure to disclose other facts. First, there was no "loan" or "borrowing transaction" in June 1969. Rather, in April of that year Hill agreed to transfer 10,000 shares to Gray who in turn executed a promissory note which provided that he would not be personally liable for this $300,000 debt. Second, Hill was more than a personal acquaintance; she was a client to whom Gray owed the duty not to engage in any overreaching. At page 15 there is no hint of this fact and, indeed, the fact that Gray was a lawyer was disclosed at page 19 in the section entitled "Information Regarding Directors and Others" so that juxtaposition of the disclosures on pages 15 and 19, re-

spectively, could give rise to the false inference that Gray *did not* act as attorney for the "personal acquaintance" who had "lent" him the funds to "purchase" 10,000 shares. Thus, the proxy statement failed to succinctly and adequately disclose that Gray owned of record 10,000 of his entire holding of 10,100 shares by virtue of the good graces of a client, and by describing the Gray-Hill transaction the way it did, lent a connotation of regularity and an aura of respectability to this "transaction" that was lacking from the start.

Since Gray did not "own" 10,100 shares free and clear, the statement on page one that he was the largest single stockholder on the board of directors as of July 22, 1970 is also false. For example, Berg owned 7,220 shares on that date. (PX 8 at 16).

The misinformation concerning the circumstances giving rise to Gray's "ownership" of 10,000 shares was "material" within the meaning of *Gould v. American-Hawaiian Steamship Co., supra.* There is a substantial likelihood that a reasonable shareholder would attach substantial importance to the nature of Gray's investment in Scotten, Dillon. Gray had been one of the plaintiffs in *Dillon v. Berg* and was a director on the lawful board as constituted on July 22, 1970 who had voted in favor of soliciting proxies, and if some or all of the Gray faction nominees were elected, he would be sitting with them on the board at least until the expiration of his term of office. Thus it was clear that he had been taking an active role in the affairs of Scotten, Dillon, and would continue to do so if only to acquaint the nominees with corporate matters. No more concrete manifestation and explanation of Gray's concern for Scotten, Dillon could be found than a sizeable investment in the Company; by the

same token, disclosure of Hill's beneficial ownership of Gray's 10,000 block of shares could lead the reasonable shareholder to question the sincerity and firmness with which Gray had carried out and would be carrying out his responsibilities as director. Furthermore, his special status as a lawyer cast a favorable impression as to his prudence and business judgment, when in point of fact the overreaching he exhibited in enticing Hill into selling her shares and the brazenness with which Gray repeatedly lied to this Court in prosecuting *Dillon v. Berg* would be of substantial concern to a reasonable shareholder.

 Gray is liable for his intentional approval of these misstatements.[23] Grass is liable for recklessly failing to ascertain the nature of the transaction between Gray and Hill. Grass' longstanding representation of Gray in *Dillon v. Berg*, his awareness of this Court's order that the proxy materials for the reconvened shareholders meeting comply with all SEC rules and regulations, his awareness that there was a "debtor-creditor" relation between Gray and Hill, and his knowledge that Hill was Gray's client should have put him on notice to diligently ascertain the facts surrounding the transfer of the 10,000 shares from Hill to Harold Gray.[24]

## C. *Disclosures Concerning Fred Davis*

 The statement in the proxy that Davis owned 3,100 Scotten, Dillon shares is patently false. Davis owned beneficially only 1,100 shares and of record 2,000 additional shares which he held as nominee for William Knauer, a senior officer of Helme Products.

This false information was material for two reasons. First, a reasonable sharehold-

---

**23.** These misstatements also violate Rule 14a–3, 17 CFR § 240.14a–3(a) and Schedule 14A, item 6(a)(4). They require that proxy materials disclose for each person whose term of office will continue after the election of directors for which the proxy is being solicited, the number of shares he beneficially owns directly or indirectly, and if applicable, disclose that he is not the beneficial owner of other shares to which he has record title.

**24.** In Gray's Schedule 14B (PX 21), ostensibly prepared by Grass during the second week of September 1971, it was noted that Gray owned beneficially 10,100 shares "having purchased 10,000 shares with funds borrowed from P. M. Hill, a personal acquaintance," and that "this loan is still outstanding." The Court declines to infer that Grass knowingly misrepresented the Gray-Hill transaction, although Gray prepared his 14B in consultation with Grass.

er in deciding how to vote his proxy desired accurate information about the precise nature of the investment in Scotten, Dillon of each director who would be sitting with the nominees elected at the Reconvened 1970 Annual Shareholders Meeting, who had voted in favor of the proxy solicitation and who had been a named plaintiff in *Dillon v. Berg.* Alternatively such information about Davis would be of the utmost importance since Davis and Power had negotiated the tobacco packaging contract with Bloch Brothers Tobacco Co., Helme Products' wholly-owned subsidiary. Davis' apparent expertise in the tobacco field and his ties to Power made him a source of ready guidance to new and old directors about Power's performance and the profitability of Scotten, Dillon's tobacco operations. Thus, the positive image conveyed in the proxy statement had to be tempered by the disclosure of a massive conflict of interest, i. e., that since the summer of 1968 he had been holding 2,000 of his 3,100 shares as nominee for a senior executive of Helme Products, Scotten, Dillon's major business competitor. See *Gould v. American-Hawaiian Steamship Co.,* Nos. 75–1338 and 75–1339 (C.A.3, April 8, 1976), slip op. at 20.

Davis is liable for this misstatement. He intentionally approved it, an act all the more brazen since he had continually represented to the Court in *Dillon v. Berg* that he was the beneficial owner of 3,100 shares. Grass is also liable for Davis' misrepresentation because of his negligence. On several occasions Grass was put on notice of the possibility that Davis did not beneficially own some or all of his 3,100 shares, viz., at the meeting with McGonigle on June 21,

1971 and at the meeting in Buffalo with Berg and Cornell later that summer on July 21. Grass also failed to examine Davis' cancelled checks used to "purchase" the 3,100 shares and Grass failed to send a letter of rectification[25] to the shareholders following Davis' confession that Knauer did own 2,000 of Davis' 3,100 shares.[26]

D. *Disclosures Concerning Andrew N. Grass, Jr.*

The proxy statement is faulted for failing to provide any estimate of the amount of attorneys' fees that Windels, Merritt & Ingraham intended to seek from Scotten, Dillon Company for the prosecution of the *Dillon v. Berg* lawsuit.[27] It is manifest that a reasonable shareholder would want to know the range or amount of attorneys' fees to be sought by the Windels firm since Davis, Gray and Dillon might be sitting on the board with Grass and the three other nominees when the matter came up for a vote. See *Chris-Craft Industries, Inc. v. Independent Stockholders Committee,* 354 F.Supp. 895, 913–914 (D.Del.1973). For this omission, Grass is liable.[28]

The proxy statement is also faulted for failing to disclose that the Windels firm was special counsel to C. B. Richard, Ellis & Co., with the result that any relationship between Grass and Schroder was hidden from shareholders. The Court is inclined to agree that this omission made the proxy materially misleading. While there does not appear to be a conflict of interest in Grass' acting as director of Scotten, Dillon and as special counsel to C. B. Richard, Ellis, the very appearance of an alliance of

---

**25.** Rule 14(a)(9) specifically requires that proxy solicitation material which has become false or misleading must be corrected by subsequent materials.

**26.** These misstatements also violate Rule 14a(3)(a) and Schedule 14A, Item 6(b)(4), for the reasons stated in footnote 23 *supra.*

**27.** At page 15 there appears this passage: "The amount of fees payable to Windels, Merritt & Ingraham is indeterminate and shareholders will not be requested to approve the payment of such amount."

**28.** The omission also violates 17 CFR § 240.-14a–3(a), § 240.14a–101, Item 7(f)(2), mandating the disclosure of any presently proposed transaction with the issuer in which a nominee for election as director has a direct or indirect material interest. This disclosure must include, where practicable, the amount of such interest. Here, a range of proposed attorneys' fees could have been provided with a modicum of effort by estimating the hours expended in the *Dillon v. Berg* suit.

interest between Grass and Schroder is material since, as stated by the Third Circuit in *Gould v. American-Hawaiian Steamship Co.*, "there is a substantial likelihood that the omission may have led a stockholder to grant a proxy" to the Gray faction on the assumption that none of the nominees, other than Gray and Schroder, was connected with the other in other business ventures or legal relationships.

For this omission Grass, Gray and Schroder are liable.

E. *Disclosure of the Identity of Those Soliciting Proxy Votes; Disclosures Concerning the Court's Opinion and Order in Dillon v. Berg; Disclosures Concerning the Aftermath of Dillon v. Berg*

■ With the issuance of the order in *Dillon v. Berg* directing the reconvening of Scotten, Dillon's 1970 annual shareholders meeting, the status of the Company's current management was placed in serious doubt. It was this Court's intention, as manifested by its order of June 10, 1971, to turn the clock back to July 22, 1970 to allow the shareholders the opportunity to participate in an appropriate 1970 annual meeting at which several directors were to be elected to the board. Since August 22, 1970, however, the Company had been managed by a *de facto* constituted board of directors. Moreover, on March 31, 1971, the 1971 annual shareholders election had been held, following a proxy solicitation effort, which resulted in the election of Prifti and Bean to the board, but over three months later Len Dillon and Fred Davis instituted suit in this court to set aside the 1971 election.[29]

29. Subsequently on December 16, 1971, this Court declared void Prifti's and Bean's election to the board, reinstating Dillon and Davis "until their successors are duly elected and qualified or until the positions which they occupy are otherwise legally terminated." *Dillon v. Scotten, Dillon Co.*, 335 F.Supp. 566 (D.Del. 1971).

30. The SEC warned Grass at least twice that the heading should not connote the approval of management and that it therefore should read, "This solicitation is by a majority of the directors in office on July 22, 1970." (See PX 41 at 1; PX 45 at 1).

In this unsettled environment, where the leadership and governing policies of Scotten, Dillon were subject to challenge and change, it was incumbent upon those issuing proxy materials for the Reconvened 1970 Annual Shareholders Meeting to clearly and compactly disclose their identity and the reasons for the reconvening of the meeting.

Regretfully, the proxy statement was not the model of circumspection and restraint required to eliminate possible misimplication. For example, the proxy statement opened with the heading "this solicitation has been authorized by a majority of the directors of the Company in office on July 22, 1970"[30] and it closed on page 21 with the subscription "Scotten, Dillon Company." On page 6 the section entitled "Persons Making the Solicitation" stated that "this solicitation is pursuant to the Order of the United States District Court for the District of Delaware." These key provisions, focusing the reader's attention on the legitimacy of the proxy solicitation, first as *authorized* by a majority of the board in office on July 22, 1970, then as made pursuant to the order of the Court, and finally as subscribed to by Scotten, Dillon Company, diverted attention from the obvious, viz., that the proxy solicitation emanated from votes of four directors (Gray, Davis, Dillon and Power) who constituted a majority of Scotten, Dillon's *de jure* board as of July 22, 1970 that had been specially renewed in 1971 as part of relief granted in the *Dillon v. Berg* litigation. The use of the words "authorized" and "pursuant to the order of" lent a connotation of judicial and managerial approval to the goals of the proxy solicitation which was clearly unwarranted.[31]

31. This connotation was heightened at other portions of the proxy statement, e. g., this passage at page 15:

"At the meeting on July 1, 1971, of the Board of Directors of the Company pursuant to the Order of the U. S. District Court, District of Delaware the firm of Windels, Merritt & Ingraham was engaged as special counsel for the purpose of preparing this proxy material and in connection with the contemplated special meeting."

This misimpression was reinforced by the proxy card (PX 7), which was headed "This solicitation has been authorized by a majority of the directors of the company in office on July 22, 1970." The card provided a shareholder the choice of voting for all four Gray faction nominees or none, a fettered exercise of corporate suffrage. Had the shareholder considered his options in casting his proxy he must have concluded that they were so limited by express approval of the Court and current management. Further evidence of this misimpression is found in the Reminder Notice mailed to shareholders on October 18, 1971. (PX 10). The notice was captioned and signed Scotten, Dillon Company. It appealed to the fraternal instincts of the shareholder with statements such as "Your signed proxy will be helpful, whether your holding is large or small, and will aid us in avoiding further expense and delay."

Also omitted from the proxy statement was a brief description of the July 1, 1971 resolution calling for the expansion of the board to fifteen members and its nullification by the federal court *sua sponte* on July 2, 1971, formalized by the issuance of an order of July 7, 1971. The false implication caused by the omission was compounded by what the proxy statement did disclose on pages 4–5, namely, that the Court entered *orders* on June 10, 1971 and July 7, 1971 and that meetings of the board of directors as constituted on July 22, 1970 were held on July 1 and July 16, 1971 pursuant to the "aforesaid order" of the Court. This disclosure, coming on the heels of a jaundiced discussion at pages 3–4 of Berg's role in the events leading up to the initiation of *Dillon v. Berg*, shielded the reader from any implication, let alone express knowledge, that the Gray faction had not specifically adhered to the rules of fair play either.

The aforegoing false and misleading affirmative statements and omissions cumulatively are "material" misstatements. By

their frequent and strategic placement in the proxy statement, proxy card, and Reminder Notice, a reasonable shareholder was deprived of the opportunity to ascertain the truth of several matters that would be of substantial importance to him in deciding how to cast his proxy. In order for him to weigh the merits of the proposal to increase the board to nine members and the qualification of the nominees, he had to understand that the board of directors of Scotten, Dillon actually sitting during the period from June through October 1971 was not the board conducting the proxy solicitation and that the operating executives of Scotten, Dillon also did not acquiesce in the proxy materials. Furthermore, he had to have a full understanding of this Court's role in the *Dillon v. Berg* litigation; he would deem it important that the Court was only an umpire in the intra-corporate battle, that it had favored neither side in *Dillon v. Berg* and that it did not promote any or all of the nominees for directorship sponsored for election by the Gray faction at the Reconvened 1970 Annual Shareholders Meeting.

Having participated in the *Dillon v. Berg* litigation and having been aware of the numerous criticisms offered by the SEC and the Berg faction members concerning the various drafts of proxy materials, Grass knew or should have known that the above described portions of the final proxy materials were misleading for which he is liable. Davis, Dillon and Gray are also liable because, as directors, they certainly should have known that the order of July 7, 1971 nullifying the proposed expansion of the board to fifteen was of importance to shareholders who until then would be expected to favor the plaintiffs in *Dillon v. Berg* for combating Berg's unscrupulous eviction of Power from the board in July 1970. Gray, Davis and Dillon were present at the July 1 meeting (PX 15, page 1) and must be held to be aware of its importance.[32]

---

**32.** So ends the Court's discussion of Rule 14(a)(9) violations by all of the defendants except Hill and C. B. Richard, Ellis & Co. The Court will not consider three of plaintiff's contentions directed to these defendants: (1) mis-statement concerning Baratelli's employment, (2) description of the terms to which the directors would be elected at the Reconvened 1970 Annual Shareholders Meeting and (3) passages at pages 19–20 qualifying or calling into

## IV. MRS. HILL'S LIABILITY

Plaintiff invokes two separate reasons for holding Mrs. Hill jointly and severally liable with certain of the defendants for the expenses of the proxy solicitation for the Reconvened 1970 Annual Shareholders Meeting.

### A. *Failure To File a Schedule 14B*

Plaintiff contends that because Mrs. Hill transferred 10,000 Scotten, Dillon shares to Gray in exchange for a promissory note, under 17 CFR § 240.14a–11 she was required to file a Schedule 14B with the SEC before it could clear the Gray faction's proxy materials. Mrs. Hill never filed a Schedule 14B and plaintiff claims that her failure caused the Gray faction's proxy statement to be in violation of Schedule 14A, Item 4(b), which requires that certain information disclosed in a Schedule 14B likewise be disclosed in the proxy materials. For this failure, the plaintiff seeks to impose liability on Mrs. Hill and Harold Gray, her attorney.

The Securities Exchange Act of 1934, as implemented by 17 CRF § 240.14a–11, provides that a Schedule 14B must be filed by a "participant" in an "election contest." This Court will assume *arguendo* that an "election contest" existed between the Gray faction and the Berg faction-dominated "Committee to Clarify Management of Scotten, Dillon Company" in connection with the Reconvened 1970 Annual Shareholders Meeting. Proceeding under this assumption, it is next necessary to determine whether Mrs. Hill was a "participant."

Plaintiff's characterization of Mrs. Hill as a "participant" relies upon one of the several definitions contained in 17 CFR § 240.14a–11(b). It reads § 240.14a–11(b)(5) as descriptive of her transaction with Gray whereby she transferred 10,000 shares in exchange for his note, because this portion of the regulation defines a "participant" as

"Any person who lends money or furnishes credit or enters into any other arrangements, pursuant to any contract or understanding with a participant [Harold Gray] [33] for the purpose of financing or otherwise inducing the purchase, . . holding or voting of securities of the issuer [Scotten, Dillon] by any participant [Harold Gray] or other persons, in support of a participant [the Gray faction] [34] or in opposition to a participant [The Committee to Clarify the Management of Scotten, Dillon Co.; or the Berg faction]. . . . ." [34]

The record in this case establishes that in April 1969 Mrs. Hill (then Mrs. Briggs) transferred to Harold Gray 10,000 shares of Scotten, Dillon common in exchange for a promissory note requiring payment on demand on or before April 24, 1974. (PX 23). This transaction occurred well before the events in 1971 giving rise to the reconvening of the 1970 Annual Shareholders Meeting and even before the commencement of the *Dillon v. Berg* lawsuit. Thus, Mrs. Hill was not a person who furnished credit to Gray for the purpose of financing the purchase of securities by Gray in opposition to Berg or the Berg faction. Subsequently, in 1971 Mrs. Hill did not actively discuss the *Dillon v. Berg* suit and its aftermath with Gray (Docket Item 137 at 36, 38, 40, 42, 46–47) particularly since she was in Europe from June through August of that year. (Tr. 342, 354–355). This Court, therefore, is unable to conclude that because Mrs. Hill did not demand full payment on the note or retrieve her stock from Gray between May through October 1971, she acquiesced or participated in the Gray faction's efforts to gain control of Scotten,

question the legality of Power's dismissal in December 1970.

**33.** 17 CFR § 240.14a–11(b)(2) defines "participant" as "any director of the issuer [Scotten, Dillon] and any nominee for whose election as a director proxies are solicited."

**34.** 17 CFR § 240.14a–11(b)(3) defines "participant" as "any committee or group which solic-its proxies, any member of such committee or group, and any person whether or not named as a member who, acting alone or with one or more other persons directly or indirectly takes the initiative, or engages in organizing, directing or arranging for the financing of, any such committee or group."

Dillon. The evidence simply does not sustain plaintiff's contentions that Mrs. Hill was a "participant" within the meaning of 17 CFR § 240.14a–11(b)(5) and no liability for proxy solicitation expenses can be predicated on her failure to file a Schedule 14B.

### B. *Failure to File Schedule 13D*

Plaintiff's second basis for imposing liability on Mrs. Hill is her failure to file a Schedule 13D with the SEC required by 15 U.S.C. § 78m(d)(1) and 17 CFR § 240.13d–1, thereby causing an omission from the Gray faction's proxy statement. For this failure plaintiff seeks to hold her jointly and severally liable with Gray, Grass, Schroder and C. B. Richard, Ellis & Co., for proxy solicitation expenses. 15 U.S.C. § 78m(d)(1), commonly known as the Williams Act, requires that all "persons" within 10 days after acquiring directly or indirectly the beneficial ownership of more than 5% of the class of any equity security registered pursuant to the Securities Exchange Act of 1934 must file a statement with the SEC that provides information listed in 15 U.S.C. § 78m(d)(1)(A)–(E). A "person" in this context is defined as "two or more persons [who] act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of the securities of an issuer . . . ." 15 U.S.C. § 78m(d)(3). It is plaintiff's contention that on and after May 6, 1971 Mrs. Hill, Harold Gray, Robert Schroder, Andrew Grass and C. B. Richard, Ellis & Co. were a "person" within the meaning of the Williams Act.

The facts essential to disposition of this claim are that as of July 1969 Hill owned of record 19,150 shares of Scotten, Dillon common stock, Gray owned of record 10,100 shares, while C. B. Richard, Ellis & Co. through its own account owned 1,000 shares. (Tr. 227, 230). As of July 22, 1970, Schroder owned 700 shares and Grass

owned none. (PX 8 at 14). There were 216,216 shares entitled to vote at the Reconvened 1970 Annual Shareholders Meeting. (PX 8 at 7). Five percent of the shares entitled to vote at the meeting is 10,811.[35]

The primary thrust of the Williams Act has been described as "to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party." *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d, 12 (1975). However, in *GAF Corp. v. Milstein,* 453 F.2d 709 (C.A.2, 1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972) the Second Circuit did acknowledge the possibility that shareholders who in the past had acquired shares independently and in their individual capacities might also be subject to Williams Act reporting requirements if subsequent to such individual and independent acquisition they agreed to act in concert to gain control. According to *GAF,* since the definition of "person" in 15 U.S.C. § 78m(d)(4) refers to groups formed for the purpose of acquiring *or holding* or disposing of securities, *id.* at 718 n.18, this definition is indicative of Congressional intent to force the disclosure of potential changes in control resulting from the formation of alliances among existing shareholders as well as from the recent acquisition of ownership, either individually or collectively by means of tender offers or in the market. The broad sweep of *GAF* has not been followed by some cases. *See, e. g., Nicholson File Co. v. H. K. Porter Co.,* 341 F.Supp. 508 (D.R.I.1972). Nevertheless this Court will assume *arguendo* that the alliance of preexisting shareholders who then in the aggregate own more than 5% of the shares of any class of equity securities is a "person" required to file pursuant to the Williams Act.

---

**35.** While Hill's 19,150 shares constitute more than 5% of the shares entitled to vote, she was not required to file a Schedule 13D for this reason alone since prior to December 22, 1970 Williams Act reporting requirements were triggered by 10% share ownership and the Act as

amended is not applied retroactively. *Nicholson File Co. v. H. K. Porter Co.,* 341 F.Supp. 508, 517 (D.R.I.1972). Plaintiff's Williams Act contention therefore can only be based on the fact that Hill acted in concert with one or more of the other defendants.

The facts in this case do not warrant the conclusion that on, before, or after May 6, 1971 Mrs. Hill agreed with Gray to form a voting block of Scotten, Dillon shares. As described in the preceding section, Hill's intimate involvement with Gray regarding Scotten, Dillon began in January 1969 and ended by April of the same year. Later in the summer of 1969 (Tr. 331) Hill expressed dissatisfaction with her investment in the Company, and Gray promised to try to help her sell her 19,150 shares. Periodically thereafter Hill and Gray discussed Scotten, Dillon affairs. Hill would complain of the infighting within the Company (Tr. 330–331) and Gray would criticize current management. (Tr. 351, 380–382; Docket Item 137 at 38–40, 47–48). Never was there an agreement reached between them to act in concert to attempt to control the board or to vote as a cohesive block at the Reconvened 1970 Annual Shareholders Meeting or any other annual meeting. (Tr. 329, 354, 520). Rather, Mrs. Hill turned to Gray for the best advice as to how to extricate herself from her unprofitable investment and Gray simply advised her to ride the situation out and hope for the best. (Tr. 384; Docket Item 137 at 36, 39, 60–61, 64, 67). This interplay did not make Mrs. Hill a "person" within the meaning of the Williams Act.

There is also no evidence in the record that Hill reached an agreement with either Schroder or Grass concerning control of Scotten, Dillon or concerning the voting of shares as a block at the Reconvened 1970 Shareholders Meeting. Mrs. Hill denies discussing with these gentlemen the possibility of obtaining control of Scotten, Dillon by pooling their voting interests. (Tr. 335, 336; Docket Item 137 at 49). This denial is not surprising. Schroder was simply the broker through whom she placed her stock orders at C. B. Richard, Ellis & Co. (Docket Item 137 at 33) and whom she contacted in order to change record ownership of the "McCusker Block," the 10,000 block of Scotten, Dillon shares that she had transferred to Gray. (Docket Item 137 at 41, 48–49, 67,

69). Mrs. Hill met Grass once at a meeting in the offices of C. B. Richard, Ellis & Co. during which the subject of "computers" was discussed. (Tr. 335; Docket Item 37 at 42). It is true that Grass *may* have advised her during the period May to October 1971, through Gray, not to acquire additional shares of Scotten, Dillon stock (Tr. 375–376; Docket Item 179 at 18; Docket Item 63 at 438; Docket Item 163 at 611–614, 665) but such counsel, in the absence of other evidence indicative of an agreement with Grass, cannot link Hill and Grass.[36] (Docket Item 137 at 64; Docket Item 63 at 441). *See Corenco Corp. v. Schiavone & Sons Inc.,* 488 F.2d 207, 217 (C.A.2, 1973).

Finally, there is no evidence that Hill reached an agreement with C. B. Richard, Ellis & Co., owner of 1,000 shares of Scotten, Dillon through its own account (Tr. 229–230, 234, 240–241), to act in concert at the Reconvened 1970 Annual Shareholders Meeting in an attempt to gain control of Scotten, Dillon. Hill never discussed Scotten, Dillon affairs with "anyone" at C. B. Richard, Ellis & Co. (Docket Item 137 at 52) and her nominal contacts with Grass and Schroder cannot constitute a "group" for purposes of the Williams Act.

## V. LIABILITY OF C. B. RICHARD, ELLIS & CO.

Plaintiff asserts that C. B. Richard, Ellis & Co. ("C. B. Richard") was a member of a "group" within the rubric of the Williams Act because during the period June to October 1971, Gray, a limited partner of C. B. Richard spearheaded the proxy solicitation effort; Schroder, a general partner in C. B. Richard was a nominee for election at the Reconvened 1970 Annual Shareholders Meeting, Grass, a partner of the Windels firm, the general counsel to C. B. Richard, Ellis was also a nominee; and Mrs Hill, a large customer of C. B. Richard, owned 19,150 shares of Scotten, Dillon. The Court has already determined that no agreement existed between Mrs. Hill and C. B. Richard for the purpose of the Williams Act. Accordingly, remaining for disposition are the

**36.** Besides, Grass owned no shares entitled to vote at the meeting.

critical links, if any, between C. B. Richard, Gray, Schroder and Grass. The pertinent figure is 10,811 shares (5% of the shares entitled to vote at the meeting).

C. B. Richard is a partnership organized under the laws of the State of New York and is a registered broker dealer. (Docket Item 180 at 3). In 1971 there were four limited partners and seven general partners (Tr. 221) in C. B. Richard. Schroder was managing partner in charge of the "back room." (Tr. 216). Occasionally, C. B. Richard invested in corporations. More often, it permitted its limited and general partners to invest their private funds in corporations (Tr. 214), and prior to 1972 it encouraged them to seek directorships in the corporations in which they had invested. About this time, Schroder told Harold Van Buren Richard ("Richard"), a senior partner in C. B. Richard, that he thought Scotten, Dillon had a "good future" for Schroder's own personal investment portfolio. (Tr. 216). Later on Schroder informed Richard about the Reconvened 1970 Annual Shareholders Meeting. (Tr. 216). However Schroder failed to discuss the proxy solicitation and Richard, who led discussions at partnership meetings concerning C. B. Richard's investments (Tr. 214), had no knowledge of Schroder's activities in connection with the proxy solicitation for the Reconvened 1970 Annual Shareholders Meeting. (Tr. 226). Richard never discussed Scotten, Dillon affairs with Gray (Tr. 225–226, 227), and he denies having any discussion with Grass about the proxy solicitation. (Tr. 227).

The Court is unable to conclude from the above set of facts that C. B. Richard entered into an agreement with Gray, Schroder or Grass concerning the control of Scotten, Dillon affairs, or in particular, to vote its 1,000 shares in favor of the Gray slate of nominees at the Reconvened 1970 Annual Shareholders Meeting in concert. To begin with, C. B. Richard acquired this nominal investment in a fortuitous and unplanned manner. Moreover, an active agreement is what the Williams Act seems to require for the definition of "person," see *GAF Corp. v. Milstein, supra,* 453 F.2d at 717; however,

assuming *arguendo* that something less than active or express agreement is required, the record remains wanting. It is apparent that the C. B. Richard firm kept the personal investment decisions and transactions of its general and limited partners wholly separate from the firm's decisions because there is no evidence here of a pattern or practice whereby the partnership would voluntarily invest or retain investments in corporations in which its partners had invested their own funds initially. This being the case, it is impossible for the Court to stretch the principles of partnership law in this context. See *Gould v. American-Hawaiian Steamship Co.,* Nos. 75–1338 and 75–1339 (C.A.3, April 8, 1976), slip op. at 30; *Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880, 884–886 (C.A.3, 1975).

In sum, the Court has found that there was no violation of 15 U.S.C. § 78m(d) in this case. Necessarily, the Court is unable to conclude that the failure of the proxy statement to identify Grass, Gray, Schroder, Hill and C. B. Richard, Ellis & Co. as a Williams Act "group" or "groups" is a material defect and therefore the Court holds that the proxy statement does not violate Rule 14a–9 in this respect.

## VI. THIRD PARTY COMPLAINT

The defendants, in a third party complaint (Docket Item 104), seek to impose liability upon the third party defendants, Berg, Summers and Bissell, for any liability imposed upon the defendants by reason of the amended and supplementary complaint. The third party complaint alleges that Berg, Summers and Bissell, directors and officers of Scotten, Dillon in 1971, breached their fiduciary duties by failing to advise Grass to amend certain statements in the proxy statement which they knew or should have known were false and misleading and which Grass and the other defendants did not know were false or misleading. It is broadly alleged that the fiduciary duties "owed" to the Court, Scotten, Dillon Company, its stockholders, officers, directors, counsel and other agents, including third party plaintiffs, obligated the third party defendants "to assure that the proxy mate-

rial for the reconvened 1970 annual meeting complied in all respects with applicable law" (par. 22), and that their breach of their duties was the proximate and direct cause of any violation by the defendants of Section 14(a) of the Securities Exchange Act of 1934.

After fully considering the evidence, the Court concludes that the third party plaintiffs have failed to sustain their burden of proof that Berg, Summers and Bissell withheld any information from the Gray faction. As early as August 20, 1971, Henry Cornell, Berg's partner and attorney for Scotten, Dillon, expressed disagreement with Grass' use of the term "management" in the draft proxy, with its discussion of *Dillon v. Berg* opinion, and with disclosures concerning Ralph Power. (PX 35). Cornell's letter of August 20 was addressed to Scotten, Dillon Company, attention of Summers, and a carbon copy was forwarded to the SEC, which in turn notified Grass of the letter's existence. (PX 41 at 6–7). In addition, Berg specifically advised Grass of a discrepancy in the record ownership of Davis' shares, as opposed to their true beneficial ownership. The Court concludes that the third party defendants adequately informed Grass of any and all pertinent facts which were found in or omitted from the proxy materials prepared by Grass, such that the material misstatements under § 14(a) are his fault, as well as the fault of Gray, Dillon, Schroder, Goldschmidt, Baratelli and Davis.

For the foregoing reasons, the Court concludes that judgment should be entered declaring (1) that all of the named defendants except for Hill and C. B. Richard, Ellis & Co., are jointly and severally liable for the $29,940.50 in expenses incurred in connection with the proxy solicitation for the Reconvened 1970 Annual Shareholders Meeting of Scotten, Dillon held on October 27, 1971, and (2) that Scotten, Dillon or the third party defendants are in no way liable for such expenses.

This opinion shall constitute the findings of fact and conclusions of law required by Rule 52(a), F.R.Civ.P.

Judgment will be entered in accordance with this opinion.